Charles Wertman, Esq.
Law Offices of Charles Wertman P.C.
11 Sunrise Plaza
Suite 301
Valley Stream, NY 11580
(516) 284-0900

Chapter 13

Case No.: 1-19-42993-cec

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X

In Re:

DEANA MCALMON,

**NOTICE OF MOTION
FOR AN ORDER
GRANTING DEBTOR'S
REQUEST TO ENTER
INTO THE LOSS
MITIGATION
PROCEEDING**

Debtor(s)

-------------------------------------------------X

PLEASE TAKE NOTICE, that upon the annexed application of Charles Wertman, Esq.,
attorney for the Debtor, DEANA MCALMON, a motion will be made to a Term of this
Court for an Order granting Debtor's Request to Enter into the Loss Mitigation
Proceeding with CIT Bank, N.A., together with other, further and different relief as this
Court deems just, proper and equitable.

Date and Time:            September 17, 2019 at 11:00 PM.

Bankruptcy Judge:         Honorable Carla E. Craig

Courthouse:               271-C Cadman Plaza East,
                          Courtroom No.: 3529
                          Brooklyn, NY 11201

Dated: Valley Stream, New York
       August 13, 2019

LAW OFFICES OF CHARLES WERTMAN, P.C.

BY: Charles Wertman, Esq.
Attorney for Debtor
11 Sunrise Plaza
Valley Stream, NY 11580
(516) 284-0900

TO:    United States Trustee
       CIT Bank, N.A.

Charles Wertman, Esq.
Law Offices of Charles Wertman P.C.
11 Sunrise Plaza
Suite 301
Valley Stream, NY 11580
(516) 284-0900

Chapter 13

Case No.: 1-19-42993-cec

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------X

**ATTORNEY AFFIRMATION**

In Re:

DEANA MCALMON,

Debtor(s).

------------------------------------------------------X

TO:   THE HONORABLE CARLA E. CRAIG, CHIEF JUDGE
      UNITED STATES BANKRUPTCY COURT, EDNY

CHARLES WERTMAN, ESQ., an attorney duly licensed to practice law before

the Courts of the State of New York, affirms upon information and belief, under penalty

of perjury, the following:

1)      I am the principal attorney at the Law Offices of Charles Wertman, P.C.,

the attorney of record for the Debtor in the above-entitled action, DEANA MCALMON.

2)      This Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§1334 & 157.

3)      I submit this Motion for an Order granting an entry into the Loss Mitigation

Proceeding in relation to the General Order No. 676 allowing the debtor herein to

participate in the Loss Mitigation Proceeding.

4)      The debtor commenced the above-captioned bankruptcy case on May 15,
2019 (the Filing Date) by filing a voluntary petition for relief pursuant to Chapter 13 of
the U.S. Bankruptcy Code. Please see Docket No.: 1.

5)      The Debtor commenced the above-referenced bankruptcy petition with the
intention to stop the foreclosure action and to modify the mortgage secured against her
primary residence.

5)      The Debtor is the owner of the property located at 941 E. 104th Street,
Brooklyn, NY 11236. This real property is the Debtor's primary residence and the debtor
wishes this property to be a subject of the Court's Loss Mitigation Proceeding.

6)      On June 25, 2007 the Debtor executed and delivered a Promissory Note
and a Mortgage, annexed hereto as Exhibit "A", securing payments of the Note in the
amount of $552,500.

7)      Currently, and at the time of the filing, CIT BANK, N.A., holds the subject
mortgage on the Debtor's Property.

8)      The last four digits of the Debtor's loan number is 2741.

9)      The amount necessary to pay off the mortgage is $609,331.16. The
amount needed to reinstate is approximately S83,129.48.

10)     The house currently has an estimated value of approximately
$615,000.00, pursuant to the appraisal, annexed herein as Exhibit "B".

11)     The Debtor defaulted on the mortgage payments due to the considerable
income loss due to the loss of employment.

12)     The Debtor's household income is expected to increase considerably, as
she is anticipating obtaining a permanent position within next four to six weeks.

13)     Currently, the debtor is receiving unemployment compensation in the amount of $1,949.85 gross monthly. In addition, the debtor's family members are contributing to her household in the amount of $2,900.00 combined. Unemployment compensation statement and Affidavits of Contribution annexed hereto as Exhibits "C" and "D" respectfully.

14)     The debtor's Chapter 13 Plan proposes to modify the mortgage and pay all sums due at 3.5% over 30 years. Based on a $609,331.16 payoff the debtor estimates a monthly modified mortgage payment of $ 2,360.00.

15)     Pursuant to the foregoing, it is respectfully submitted that no parties will be prejudiced by the approval of this motion. It is in the best interest of the estate, the Debtor and CIT Bank, N.A., to allow the Debtor herein to enter the Loss Mitigation Proceeding.

WHEREFORE, it is respectfully requested that this Court (a) grant the Order for the Debtor to enter the Court's loss mitigation proceeding with CIT Bank, N.A.; and (b) grant such other and further relief as this Court deems just and proper.

Dated: Valley Stream, New York
        August 13, 2019

LAW OFFICES OF CHARLES WERTMAN, P.C.

BY: Charles, Wertman, Esq.
Attorney for Debtor
11 Sunrise Plaza
Valley Stream, NY 11580
(516) 284-0900

# EXHIBIT "A"



## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City
Register will rely on the information provided
by you on this page for purposes of indexing
this instrument. The information on this page
will control for indexing purposes in the event
of any conflict with the rest of the document.

2007071301501002001E3227

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 29 |
|---|---|---|
| Document ID: 2007071301501002 | Document Date: 06-25-2007 | Preparation Date: 07-13-2007 |
| Document Type: MORTGAGE | | |
| Document Page Count: 27 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| EXECUTIVE SETTLEMENT SERVICES E-6847-07 | INDYMAC BANK, F.S.B. |
| 1723 E. 12TH STREET | 901 E. 104TH STREET |
| SUITE 202 | KANSAS CITY, MO 64131 |
| BROOKLYN, NY 11229 | |
| 718-339-6911 | |
| tonyleone11@msn.com | |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 8212 | 29 | Entire Lot | 941 EAST 104 STREET |

Property Type: DWELLING ONLY - 2 FAMILY

### CROSS REFERENCE DATA

CRFN_____ or Document ID___ ____ ___ or _____ Year_____ Reel ___ Page ____ ___ or File Number_____

### PARTIES

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| GLADSTONE C. MCALMON | MERS |
| 941 E. 104TH STREET | 4318 MILLER ROAD |
| BROOKLYN, NY 11236 | FLINT, MI 48507 |

x  Additional Parties Listed on Continuation Page

### FEES AND TAXES

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 552,500.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 552,500.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 2,762.50 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 6,215.63 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | RECORDED OR FILED IN THE OFFICE | | |
| TASF: | $ | 1,381.25 | OF THE CITY REGISTER OF THE | | |
| MTA: | $ | 1,627.50 | CITY OF NEW YORK | | |
| NYCTA: | $ | 0.00 | Recorded/Filed    07-20-2007 16:10 | | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 11,986.88 | 2007000375473 | | |
| Recording Fee: | $ | 172.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

*Annette M ____*

*City Register Official Signature*

NYC DEPARTMENT OF FINANCE
OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City
Register will rely on the information provided
by you on this page for purposes of indexing
this instrument. The information on this page
will control for indexing purposes in the event
of any conflict with the rest of the document.



2007071301501002001E3227

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 29 |
|---|---|---|
| Document ID: 2007071301501002 | Document Date: 06-25-2007 | Preparation Date: 07-13-2007 |

Document Type: MORTGAGE
Document Page Count: 27

| PRESENTER: | RETURN TO: |
|---|---|
| EXECUTIVE SETTLEMENT SERVICES E-6847-07 | INDYMAC BANK, F.S.B. |
| 1723 E. 12TH STREET | 901 E. 104TH STREET |
| SUITE 202 | KANSAS CITY, MO 64131 |
| BROOKLYN, NY 11229 | |
| 718-339-6911 | |
| tonylecuel1@man.com | |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 8212 | 29 | Entire Lot | 941 EAST 104 STREET |

Property Type: DWELLING ONLY - 2 FAMILY

**CROSS REFERENCE DATA**

CRFN _____ or Document ID _____ or Year _____ Reel _____ Page _____ or File Number _____

**PARTIES**

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| GLADSTONE C. MCALMON | MERS |
| 941 E. 104TH STREET | 4318 MILLER ROAD |
| BROOKLYN, NY 11236 | FLINT, MI 48501 |

[X] Additional Parties Listed on Continuation Page

**FEES AND TAXES**

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 552,500.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 552,500.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 2,762.50 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 6,215.63 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 1,381.25 | | |
| MTA: | $ | 1,627.50 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 11,986.88 | | |
| Recording Fee: | $ | 172.00 | | |
| Affidavit Fee. | $ | 0.00 | | |

NYC DEPARTMENT OF FINANCE
OFFICE OF THE CITY REGISTER



2007071301501002001C30A7

RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION)     PAGE 2 OF 29

Document ID: 2007071301501002        Document Date: 06-25-2007        Preparation Date: 07-13-2007
Document Type: MORTGAGE

PARTIES
MORTGAGOR/BORROWER:
DIANA MCALMON
941 E. 104TH STREET
BROOKLYN, NY 11236

## Exhibit A

Documents not attached to the Summons and Complaint:

1. Note, dated June 25, 2007

2. Mortgage, dated June 25, 2007

3. Modification, dated February 4, 2009

4. Modification, dated June 1, 2010

5. Assignment of Mortgage, dated October 21, 2011

6. Modification, dated February 1, 2015

# ORIGINAL

## FIXED/ADJUSTABLE RATE NOTE
(1 Year LIBOR ARM Balloon Loan - Rate Caps)

Loan #                                                                    MIN:

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE
INTEREST RATE AND HAS PROVISIONS ALLOWING CHANGES IN MY INTEREST RATE AND
MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST
RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL
BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO
OBLIGATION TO REFINANCE THIS LOAN AT THAT TIME. YOU WILL, THEREFORE, BE
REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU
WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH,
WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU
MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH
A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

June 25, 2007                          BROOKLYN                          New York
[Date]                                 [City]                            [State]

941 E 104TH ST, BROOKLYN, NY 11236

[Property Address]

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    552,500.00       (this amount is called
"Principal"), plus interest, to the order of the Lender. The Lender is   INDYMAC BANK, F.S.B., A FEDERALLY
CHARTERED SAVINGS BANK

I will make all my payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

### 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of    9.875      %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any
default described in Section 7(B) of this Note.

### 3.  PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on         August  1, 2007
I will make my monthly payments every month until I have paid all of the principal and interest and any other charges
described below that I may owe under this Note. My monthly payments will be applied as of its scheduled due date and will be
applied to interest before Principal. If, on   July  1, 2037        ., I still owe amounts under this Note, I will
pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at        INDYMAC BANK, F.S.B., P.O. BOX 78826, PHOENIX, AZ
85062-8826

or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My initial monthly payment will be in the amount of U.S. $         4,637.36  . This amount may change.

IndyMac Bank

1 Year LIBOR ARM Balloon Note - Multistate

#### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### 4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

#### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of July,    2012    , and the adjustable interest rate I will pay may change on that day every    12th    month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change is called a "Change Date."

#### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market, as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

#### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding    five and    750/1000ths    percentage point(s) (    5.750   %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date on the "Amortization Period Date" at my new interest rate in substantially equal payments. The Amortization Period Date is    July 1, 2047    , which is greater than the Maturity Date. The result of this calculation will be the new amount of my monthly payment. I acknowledge that this amount will not be sufficient to repay my loan in full on the Maturity Date and that I may owe a significant amount to the Lender on the Maturity Date.

#### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than    14.875    % or less than    5.750    %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than    two and NO/1000ths    percentage point(s) (    2.000 %    ) from the rate of interest I have been paying for the preceding    12    month(s). My interest rate will never be greater than    14.875   %, which is called the "Maximum Rate."

#### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

#### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

### 5.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my prepayment to reduce the Principal amount of the note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.    BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    2.000    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.    GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.    WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.    UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

*Gladstone McAlmon*
*As Attorney in Fact for*

_____ (Seal)          *Deane McAlmon* _____ (Seal)
GLADSTONE C MCALMON          -Borrower          DEANE MCALMON, by his/her agent and attorney          -Borrower
                                                in fact, GLADSTONE C MCALMON

_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                  -Borrower

*[Sign Original Only]*

PAY TO THE ORDER OF

WITHOUT RECOURSE
INDYMAC BANK, F.S.B.

VINCENT DOMBROWSKI
VICE PRESIDENT

## ADDENDUM TO ADJUSTABLE RATE NOTE          Loan #:
(Prepayment)

THIS ADDENDUM is made this 25th    day of    June,  2007    , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

1.    Section 5 of the Adjustable Rate Note is modified to provide that I have the right to make payments of principal at any time before they are due. A Prepayment of all of the unpaid principal is known as a "Full Prepayment." A Prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge. If within the first    one    ( 1    ) year(s) I make a Partial Prepayment or Partial Prepayment(s) of less than twenty percent (20%) of the original principal amount in any twelve (12) month period, I will not pay a Prepayment penalty. However, if within the first    one    ( 1    ) year(s), I make a Full Prepayment, Partial Prepayment or Partial Prepayments of more than twenty percent (20%) of the original principal amount in any 12-month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.

If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

2.    All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.

Dated: ___6\25\07___

_____ (Seal)
GLADSTYNE C MCALMON    -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

*Gladstone McAlmon*
*its attorney in fact for*

_Diana McAlmon_____ (Seal)
DIANA MCALMON, by his/her agent and attorney    -Borrower
in fact, GLADSTONE C MCALMON

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

_____ (Seal)
                        -Borrower

IndyMac Bank and Federally Exempted Seller Use Only
Hard Prepayment Addendum (1-3 yrs) - ARM
First Mortgages - Multistate, Arkansas (loans over $150,000)

SPD #084
(08/04)

8480278 (0407)    VMP Mortgage Solutions, Inc. (800)521-7291

## ADDENDUM TO ADJUSTABLE RATE NOTE

Loan #:

THIS ADDENDUM is made this   25th   day of   June,   2007   , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

**1. Section 4(D) of the Adjustable Rate Note is modified as follows:**

The interest rate I am required to pay at the first Change Date will not be greater than   14.875   % or less than   5.750   %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than   two and NO/1000ths   percentage point(s) (   2.000   %) from the rate of interest I have been paying for the preceding   12   months. My interest rate will never be greater than   14.875   % or less than   5.750   %.

**2. All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.**

Dated: _____6\26\07_____

_____(Seal)
GLADSTONE C MCALMON                -Borrower

_____(Seal)
                                   -Borrower

_____(Seal)
                                   -Borrower

_____(Seal)
                                   -Borrower

*Gladstone McAlmon)*
*By Attorney in Fact for*
*Deanna McAlmon* _____(Seal)
DIANA MCALMON, by his/her agent and attorney   -Borrower
in fact, GLADSTONE C MCALMON

_____(Seal)
                                   -Borrower

_____(Seal)
                                   -Borrower

_____(Seal)
                                   -Borrower

IndyMac Bank
ARM Note Addendum - Multistate
8480344 (0622)



### ALLONGE TO NOTE

Loan #

For purposes of further endorsement of the following described Note, the allonge is affixed and becomes a permanent part of said Note.

| | |
|---|---|
| Loan Amount: | $552,500.00 |
| Note Date: | 6/25/2007 |
| Borrower(s) Name: | Gladstone C Mcalmon and Deana Mcalmon, by his/her agent and attorney in fact, Gladstone C Mcalmon |
| Address: | 941 E 104th St |
| | Brooklyn, NY 11236 |

PAY TO THE ORDER OF ONEWEST BANK, FSB, WITHOUT RECOURSE

FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for Indymac Federal Bank, FSB, successor to Indymac Bank, F.S.B.

*Sandy Schneider*

Sandy Schneider
Attorney In-Fact

### ALLONGE TO NOTE

Loan #

For purposes of further endorsement of the following described Note, the allonge is
affixed and becomes a permanent part of said Note.

Loan Amount:   $552,500.00

Note Date:   6/25/2007

Borrower(s) Name:   Gladstone C Mcalmon and Deana Mcalmon, by his/her agent and attorney
in fact, Gladstone C Mcalmon

Address:   941 E 104th St

Brooklyn, NY 11236

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PAY TO THE ORDER OF:

Without Recourse

By: _____

Name: Sandy Schneider

Title:   Vice President

OneWest Bank, FSB

After recording please return to:
INOYMAC BANK, F.S.B., C/O DOCUMENT
MANAGEMENT

*[Company Name]*

*[Name of Natural Person]*
BLDG B, 901 E 104TH ST, SUITE 400/500

*[Street Address]*
KANSAS CITY, MO 64131

*[City, State Zip Code]*

——————————— *[Space Above This Line For Recording Data]* ———————————

# MORTGAGE

MIN:

## WORDS USED OFTEN IN THIS DOCUMENT

(A)     "Security Instrument." This document, which is dated        June 25, 2007
together with all Riders to this document, will be called the "Security Instrument."

(B)     "Borrower." GLADSTONE C MCALMON AND DEANNA MCALMON HIS WIFE

, whose address is  941 E 104TH ST, BROOKLYN,

NY 11236

sometimes will be called "Borrower" and sometimes simply "I" or "me."

(C)     "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and existing under the
laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026,
tel. (888) 679-MERS.    FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE
MORTGAGEE OF RECORD.                              *4319 Miller Road, Flint, MI 48561

(D)     "Lender." INOYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK
                                         will be called "Lender."  Lender is a corporation or
association which exists under the laws of         United States of America         , Lender's
address is  155 NORTH LAKE AVENUE, PASADENA, CA 91101

(E)     "Note." The note signed by Borrower and dated        June 25, 2007
will be called the "Note." The Note shows that I owe Lender  five hundred fifty two thousand
five hundred and NO/100ths              Dollars (U.S. $  552,500.00          )
plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to
pay the debt in full by       July  1, 2037

Loan No:

(F)      "Property." The property that is described below in the section titled "Description of the Property," will be called the "Property."

(G)      "Loan." The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)      "Sums Secured." The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(I)      "Riders." All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower *[check box as applicable]*:

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [x] 1-4 Family Rider | [ ] Revocable Trust Rider | |
| [ ] Other(s) *[specify]* | | |

(J)      "Applicable Law." All controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(K)      "Community Association Dues, Fees, and Assessments." All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(L)      "Electronic Funds Transfer." "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)      "Escrow Items." Those items that are described in Section 3 will be called "Escrow Items."

(N)      "Miscellaneous Proceeds." "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(O)      "Mortgage Insurance." "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)      "Periodic Payment." The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(Q)      "RESPA." "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any

Loan No:

additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

## DESCRIPTION OF THE PROPERTY

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

(A) The Property which is located at                    941 E 104TH ST                    ,
                                                        [Street]

BROOKLYN        , New York        11236        . This Property is in
[City, Town or Village]                      [Zip Code]
KINGS        County. It has the following legal description:
SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

Loan No:

## Schedule A Description

Title Number E-6847-07                                                                    Page    1

ALL that certain plot, piece or parcel of land, situate, lying and being in the
Borough of Brooklyn, county of Kings, City and State of New York, bounded and
described as follows:

BEGINNING at a point on the easterly side of West 104th Street distant 320 feet
southerly from the corner formed by the intersection of the easterly side of East
104th Street with the southerly side of Flatlands Avenue as same was laid out
and widened on the City Map 10/22/56;

RUNNING THENCE easterly part of the distance through a party wall and
parallel with Flatlands Avenue as so widened, 100 feet to the center line of the
block;

THENCE south along said center line of block, 25 feet;

THENCE westerly and again parallel with Flatlands Avenue, 100 feet to the
easterly side of East 104th Street;

THENCE northerly along the easterly side of East 104th Street, 25 feet to the
point or place of BEGINNING.

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require my payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do

not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

2. **Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:
First, to pay interest due under the Note;
Next, to pay principal due under the Note; and
Next, to pay the amounts due Lender under Section 3 of this Security Instrument.
Such payments will be applied to each Periodic Payment in the order in which it became due.
Any remaining amounts will be applied as follows:
First, to pay any late charges;
Next, to pay any other amounts due under this Security Instrument; and
Next, to reduce the principal balance of the Note.

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

3. **Monthly Payments For Taxes And Insurance.**

(a) Borrower's Obligations. I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and

where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) Lender's Obligations. Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) Adjustments to the Escrow Funds. Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 26.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

4. Borrower's Obligation to Pay Charges, Assessments And Claims. I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior lien in

Loan No:

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                    Page 6 of 17
www.compliancesource.com

MERS Modified Form 3033 01/01
14301NY  4870 (Rev. 06/07)
©2004, The Compliance Source, Inc.

a lawsuit so that in Lender's opinion, during the lawsuit, the superior lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give Borrower a notice identifying the superior lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

5.    Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.    I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period that any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires

Loan No:

New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
--- THE COMPLIANCE SOURCE, INC.---                                          Page 7 of 17
www.compliancesource.com

MERS Modified Form 3033   01/01
14301NY  04/00 (Rev. 04/02)
©2000, The Compliance Source, Inc.

otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  Borrower's Obligations to Occupy The Property. I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7.  Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.

(a)  Maintenance and Protection of the Property. I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as described in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b)  Lender's Inspection of Property. Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

8.  Borrower's Loan Application. If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

9.  Lender's Right to Protect Its Rights In The Property. If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture, proceedings which could give a Person rights

which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay these amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay these amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender every 14 days an amount equal to one-twenty-sixth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage Insurers assess their total risk on all Mortgage Insurance from time to time, and may enter into agreements with other parties that share or change their risk, or reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.

These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, any other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or reducing losses. If these agreements provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has – if any – regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to (a) receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

11. Agreements About Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date the Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also

Loan No:
New York Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 10 of 17
MERS Modified Form 3033 01/01
14300NY 04/05 (Rev. 05/08)
©2005, The Compliance Source, Inc

prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender has required Immediate Payment in Full. The proceeds of any award or claim for damages that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

12.  **Continuation of Borrower's Obligations And of Lender's Rights.**

(a)  **Borrower's Obligations.**  Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

(b)  **Lender's Rights.**  Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

13.  **Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations.**  If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument.  Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together.  This means that any one of us may be required to pay all of the Sums Secured.  However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

14.  **Loan Charges.**  Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee.  Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.  If a refund reduces principal, the reduction will be treated as a partial prepayment without

Loan No:
New York Mortgage Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—    Page 11 of 17
www.compliancesource.com

MERS Modified Form 3033 01/01
14805Y 08/02 (Rev. 04/03)
©2002, the Compliance Source, Inc.

any prepayment charge (even if a prepayment charge is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. If Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(a) · I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on the Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so. I also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized

as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat or release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

## NON-UNIFORM COVENANTS

I also promise and agree with Lender as follows:

22. **Lender's Rights If Borrower Fails to Keep Promises and Agreements.** Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."

If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of foreclosure and sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

Loan No:

New York Mortgage Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    MERS Modified Form 3033 01/01
—THE COMPLIANCE SOURCE, INC.—    Page 14 of 17    14501-NY 08/00 (Rev. 06/03)
www.compliancesource.com    ©2000, The Compliance Source, Inc

23. **Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24. **Agreements about New York Lien Law.** I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25. **Borrower's Statement Regarding the Property** [check box as applicable].

[x] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

[ ] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Security Instrument does not cover real property improved as described above.

Loan No:
New York Mortgage-Single Family-Fannie Mac/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 15 of 17
MERS Modified Form 3033 01/01
14399NY 01.09 (Rev. 04/15)
©2002, The Compliance Source, Inc.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 16 of this Security Instrument and in any rider signed by me and recorded with it.

Witnesses:

_____ (Seal)
GLADSTONE C MCALMON            -Borrower

*Gladstone McAlmon*
*As Attorney in fact for*
_Deana McAlmon_ (Seal)
DEANA MCALMON, by his/her agent and attorney    -Borrower
in fact, GLADSTONE C MCALMON

### To be recorded simultaneously here with

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

————————————— [Acknowledgment on Following Page] —————————————

State of New York                    §
                                     § ss:
County of Kings                      §

On the 25 day of June 2007 in the year 2007 before me, the
undersigned, personally appeared GLADSTONE C MCAIMON and DEANA MCAIMON, by his/her
agent and attorney in fact, GLADSTONE C MCAIMON

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s)
is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person
upon behalf of which the individual(s) acted, executed the instrument.

                                                            Signature

<span>(Seal)</span> Leonid Kats
Notary Public, State of New York               Office
     No. 01KA6112883
Qualified in Kings County
Commission Expires on July 12, 2008

                                             ƒSEAI

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this  25th  day of         June,  2007         , and
is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed
(the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's
Note to     INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

941 E 104TH ST, BROOKLYN, NY 11236

*[Property Address]*

1-4 FAMILY COVENANTS.  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

A.  ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.  In addition to
the Property described in Security Instrument, the following items now or hereafter attached to the Property to the
extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the
Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located
in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the
purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and
extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets,
sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors,
screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings,
all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property
covered by the Security Instrument.  All of the foregoing together with the Property described in the Security
Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family
Rider and the Security Instrument as the "Property."

B.  USE OF PROPERTY; COMPLIANCE WITH LAW.  Borrower shall not seek, agree to or make
a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change.
Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body
applicable to the Property.

C.  SUBORDINATE LIENS.  Except as permitted by federal law, Borrower shall not allow any lien
inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

D.  RENT LOSS INSURANCE.  Borrower shall maintain insurance against rent loss in addition to the
other hazards for which insurance is required by Section 5.

E.  "BORROWER'S RIGHT TO REINSTATE" DELETED.  Section 19 is deleted.

Loan No:                                                                MIN:

Multistate 1-4 Family Rider---Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3170  01/01
--THE COMPLIANCE SOURCE, INC.--                    Page 1 of 3          14508XU 08/00 Rev. 11/04
www.compliancesource.com                                              ©2004, The Compliance Source, Inc.

||||||||||||

F. **BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

G. **ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "subtease" if the Security Instrument is on a leasehold.

H. **ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notices of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorneys' fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)
GLADSTONE C MCALMON                    -Borrower

*Gladstone Mcalmon*
*As Aitterney in fact for*
*Deana Mcalmon*  (Seal)
DEANA MCALMON, by his/her agent and    -Borrower
atterney in fact, GLADSTONE C MCALMON

**To be recorded simultaneously here with**

_____ (Seal)
                                      -Borrower

_____ (Seal)
                                      -Borrower

*[Sign Original Only]*

Loan No:

Multistate 1-4 Family Rider—Fannie Mac/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                    Form 3170 01/01
www.compliancesource.com            Page 3 of 3    14803MU 08/00 Rev. 11/04
                                    ©2004, The Compliance Source, Inc.

## FIXED/ADJUSTABLE RATE RIDER
### (1 YEAR LIBOR ARM BALLOON LOAN - Rate Caps)

Loan #:                                                    MIN:

THIS FIXED/ADJUSTABLE RATE RIDER is made this 25th    day of June    2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Note to   INDYMAC BANK, F.S.B., A
FEDERALLY CHARTERED SAVINGS BANK

(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

941 E 104TH ST, BROOKLYN, NY 11236

··    [Property Address]

THIS NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE AND HAS PROVISIONS
ALLOWING CHANGES IN THE INTEREST RATE AND THE MONTHLY
PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST
RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE
BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of    9.875    %. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate as follows:

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first day of   July,    2012    , and the adjustable interest rate I will pay may change
on that day every    12th   month thereafter. The date on which my initial fixed interest rate
changes to  an adjustable interest rate, and each date on which my adjustable interest rate
could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an
index. The "Index" is the one-year London Interbank Offered Rate ("LIBOR") which is the
average of interbank offered rates for one-year U.S. dollar-denominated deposits in the
London market, as published in The Wall Street Journal. The most recent index figure
available as of the date 45 days before each Interest Change Date is called the "Current
Index."

1 Year LIBOR ARM Balloon Rider - Multistate

                                              Page 1 of 4                      Form 8605
8480912 (0606)                VMP Mortgage Solutions, Inc.                        06/06

If the index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding five and 750/1000ths                        percentage points (          5.750  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date on the "Amortization Period Date" at my new interest rate in substantially equal payments. The Amortization Period Date is    July  1, 2047            , which is greater than the Maturity Date. The result of this calculation will be the new amount of my monthly payment. I acknowledge that this amount will not be sufficient to repay my loan in full on the Maturity Date and that I may owe a significant amount to the Lender on the Maturity Date.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 14.875   % or less than       5.750  %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two and NO/1000ths                                                                  percentage points (       2.000   %) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than    14.875       %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

## B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1.  Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

Loan No:
8480912 (0606)                        Page 2 of 4                        Form 5805
                                                                          06/06

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above. Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Loan No:

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

*Gladstone McAlmon*
*as Attorney input for*
_____ (Seal)  *Deana McAlmon* (Seal)
GLADSTONE C MCALMON      -Borrower  DEANA MCALMON, by his/her agent and -Borrower
                                   attorney in fact, GLADSTONE C MCALMON

_____ (Seal)  _____ (Seal)
-Borrower                         -Borrower

                                  To be recorded simultaneously here with

_____ (Seal)  _____ (Seal)
-Borrower                         -Borrower

_____ (Seal)  _____ (Seal)
-Borrower                         -Borrower

Loan No:                                          Form 5805
8480912 (0606)          Page 4 of 4                06/06

# ADDENDUM TO FIXED/ADJUSTABLE RATE RIDER

Loan #:

THIS ADDENDUM to the Fixed/Adjustable Rate Rider is made this  25th  day of June,  2007      , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") and Fixed/Adjustable Rate Rider of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to  INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

## 941 E 104TH ST, BROOKLYN, NY 11236

### [Property Address]

ADDITIONAL COVENANTS.  In Addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. Section 4(D) of the Fixed/Adjustable Rate Rider is modified as follows:

The interest rate I am required to pay at the first Change Date will not be greater than  14.875      % or less than     5.750       %. Thereafter, my interest rate will never be increased or decreased on any single change  Date by more than two and NO/1000ths              percentage point(s) (     2.000      %) from the rate of interest I have been paying for the preceding   12     months. My interest rate will never be greater than      14.875      % or less than      5.750      %.

IndyMac Bank
ARM Addendum to Fixed/Adjustable Rate Rider
Multistate

8480346 (0602)

Page 1 of 2
VMP Mortgage Solutions, Inc.

1075
2/06

2. All other provisions of the Fixed/Adjustable Rate Rider are unchanged by this Addendum and remain in full force and effect.

Dated: _____

_____ (Seal)
GLADSTONE C MCALMON          -Borrower

Gladstone Mckinnon
as Attorney in fact for
Deana Mckinnon _____ (Seal)
DEANA MCALMON, by his/her agent and   -Borrower
attorney in fact, GLADSTONE C MCALMON

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

To be recorded simultaneously here with

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2007071301501002001E3227

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 29 |
|---|---|---|
| Document ID: 2007071301501002 | Document Date: 06-25-2007 | Preparation Date: 07-13-2007 |
| Document Type: MORTGAGE | | |
| Document Page Count: 27 | | |

| PRESENTER: | RETURN TO: |
|---|---|
| EXECUTIVE SETTLEMENT SERVICES E-6847-07 | INDYMAC BANK, F.S.B. |
| 1723 E. 12TH STREET | 901 E. 104TH STREET |
| SUITE 202 | KANSAS CITY, MO 64131 |
| BROOKLYN, NY 11229 | |
| 718-339-6911 | |
| tonyleone11@msn.com | |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 9212 | 29 | Entire Lot | 941 EAST 104 STREET |

Property Type: DWELLING ONLY - 2 FAMILY

### CROSS REFERENCE DATA

CRFN _____ or Document ID _____ or _____ Year____ Reel ___ Page ____ or File Number_____

### PARTIES

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| GLADSTONE C. MCALMON | MERS |
| 941 E. 104TH STREET | 4318 MILLER ROAD |
| BROOKLYN, NY 11236 | FLINT, MI 48501 |

x Additional Parties Listed on Continuation Page

### FEES AND TAXES

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 532,500.00 | | | |
| Taxable Mortgage Amount: | $ | 532,500.00 | | $ | 0.00 |
| Exemption: | | | NYC Real Property Transfer Tax: | | |
| TAXES: County (Basic): | $ | 2,762.50 | | $ | 0.00 |
| City (Additional): | $ | 6,215.63 | NYS Real Estate Transfer Tax: | | |
| Spec (Additional): | $ | 2.00 | | $ | 0.00 |
| TASF: | $ | 1,381.25 | | RECORDED OR FILED IN THE OFFICE | |
| MTA: | $ | 1,627.50 | | OF THE CITY REGISTER OF THE | |
| NYCTA: | $ | 0.00 | | CITY OF NEW YORK | |
| Additional MRT: | $ | 0.00 | | Recorded/Filed   07-26-2007 16:30 | |
| TOTAL: | $ | 11,986.88 | | City Register File No.(CRFN): | |
| Recording Fee: | $ | 172.00 | | 2007000375473 | |
| Affidavit Fee: | $ | 0.00 | | | |

*Gaatth M fill*

*City Register Official Signature*



| NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER | | |
|---|---|---|
| This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document. | | 2007071301501002001E3227 |

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 29 |
|---|---|---|
| Document ID: 2007071301501002 | Document Date: 06-25-2007 | Preparation Date: 07-13-2007 |

Document Type: MORTGAGE
Document Page Count: 27

| PRESENTER: | RETURN TO: |
|---|---|
| EXECUTIVE SETTLEMENT SERVICES E-6847-07<br>1725 S. 12TH STREET<br>SUITE 202<br>BROOKLYN, NY 11229<br>718-339-6915<br>tonyleone11@msn.com | INDYMAC BANK, F.S.B.<br>901 E. 104TH STREET<br>KANSAS CITY, MO 64131 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 8212 | 29 | Entire Lot | 941 EAST 104 STREET |

Property Type: DWELLING ONLY - 2 FAMILY

**CROSS REFERENCE DATA**

CRFN _____ or Document ID _____ or Year _____ Reel _____ Page _____ or File Number _____

**PARTIES**

| MORTGAGOR/BORROWER: | MORTGAGEE/LENDER: |
|---|---|
| GLADSTONE C. MCALMON<br>941 E. 104TH STREET<br>BROOKLYN, NY 11236 | MERS<br>4318 MILLER ROAD<br>FLINT, MI 48501 |

☒ Additional Parties Listed on Continuation Page

**FEES AND TAXES**

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 552,500.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 552,500.00 | NYC Real Property Transfer Tax: | | |
| Exemption | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 2,762.50 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 6,215.63 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 1,381.25 | | | |
| MTA: | $ | 1,627.50 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 11,986.88 | | | |
| Recording Fee: | $ | 172.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |





2007071301501002001C30A7

NYC DEPARTMENT OF FINANCE
OFFICE OF THE CITY REGISTER

Document ID: 2007071301501002
Document Type: MORTGAGE

Document Date: 06-25-2007

Preparation Date: 07-13-2007

**PARTIES**
MORTGAGOR/BORROWER:
DEANA MCALMON
941 E. 104TH STREET
BROOKLYN, NY 11236

**Modification Agreement: Please sign and return**
January 8, 2009

Gladstone C Mcalmon
Deana Mcalmon
941 E 104th St
Brooklyn, NY 11236-2815

Product: Stipulated Forbearance to Loan Modification Program
Loan Number:
Property Address: 941 104TH ST, BROOKLYN, NY 11236

This letter ("Agreement") will confirm your agreement to modify your Note and your Security Instrument as follows. Capitalized terms used herein have the meaning given them in the Note or the Security Instrument.

1. This Agreement is not binding on Note Holder, unless and until Note Holder, or servicing agent, IndyMac Federal Bank, FSS ("IndyMac"), verifies that you qualify for this modification offer. You will promptly provide IndyMac acceptable information to permit verification of your income, and make the payments shown in the payment schedule in paragraph 4 of this Agreement, while IndyMac verifies your information. If you qualify, IndyMac, will sign and return this Agreement to you, and it will be effective on the date it is signed by IndyMac. If you do not make all payments when due while we verify that you qualify, or if you do not qualify, your Note will not be modified. IndyMac will apply any payments you made to the amounts you owe.

2. The unpaid principal balance of your Note as of the date of this Agreement, before modification, is $651,459.71.

3. The Note and the Security Instrument are modified to increase the principal balance of the Note by the amounts of your arrears on the Note of $40,361.83, including past due interest in the amount of $36,304.40, past due Escrow items totaling $4,002.43 and servicing costs totaling $55.00. The new principal amount of the Note is $591,821.54. All unpaid late charges have been waived. There are no fees or other charges assessed for the modification.

4. The interest rate and monthly payment on your Note is modified as follows:

| Year | New Interest Rate | Interest Rate Change Date | New Monthly Principal & Interest Payment Amount | Estimated Monthly Escrow Payment Amount | New Monthly Payments Begin On | Number of Payments |
|------|-------------------|---------------------------|--------------------------------------------------|------------------------------------------|-------------------------------|---------------------|
| 1 | 5.125% | 2/1/2009 | $3,298.88 | Adjusts Annually | 3/1/2009 | 341 |

5. Your monthly payment stated in your Note will change, effective with the payment due on 3/1/2009 (i.e., one month after the effective date of the reduction of your interest rate, as set forth in paragraph 4 above). This monthly payment will consist of principal and interest, and will continue until the Maturity Date. This monthly payment will change as shown in paragraph 4 above.

6. The Note Holder will send you notice of these changes.

7. The Maturity Date stated in your Note does not change; the Maturity Date remains 7/1/2037.

8. The monthly payments for principal and interest, stated above, do not include required payments for taxes and insurance, which may be substantial. Your monthly requirements for taxes and insurance will change periodically during the term of your mortgage.

9. Your Security Instrument will continue to secure payment and performance of the Note as amended by this Agreement.

10. Except as modified by this Agreement, all terms and provisions of the Note, any Riders, and the Security Instrument remain in full force and effect.

11. The Note and Security Instrument are duly valid, binding agreements, enforceable in accordance with their terms, and are hereby reaffirmed.

INDYMAC FEDERAL BANK, FSB        By: _____        2/2/09  2/4/09
                                     Michael Stanford, First Vice President        Date

I/We agree to the modification of my/our Loan as described above.

_____    1/23/09        _____    1/23/09
Gladstone C Mcalmon        Date            Deana Mcalmon                Date

BULK(MOD)6S-FISIOFixed&ARMStepConv/notRea/h86408

**Modification Agreement:**
Please sign and return

# Sign & Return

May 11, 2010

If you have any questions regarding this offer,
please call us toll free at 1.888.323.3718.

Gladstone C Mcalmon and Deana Mcalmon
941 E 104th St
Brooklyn, NY 11236-2815

Product: IndyMac Mortgage Services Custom Modification
IndyMac Mortgage Services Loan Number:
Investor Loan Number:
Property Address: 941 104th St, Brooklyn, NY 11236

This letter ("Agreement") will confirm your agreement to modify the Note, dated 6/25/2007, and
the Security Instrument of the same date, recorded on 06/25/2007 in Book _____, Page(s)
_____, or Instrument or Document No. 2007071301 of the Official Records of Kings County,
State of New York. The Security Instrument encumbers the real and personal property described
in the Security Instrument and defined as the "Property," located in Kings County, New York, and
which currently has the address referenced above. Capitalized terms not otherwise defined herein
have the meaning given them in the Note or the Security Instrument.

1. This Agreement is not binding on Note Holder, unless and until Note Holder, or servicing
agent, IndyMac Mortgage Services, a division of OneWest Bank, FSB ("IndyMac"), verifies that
you qualify for this modification offer. You will promptly provide IndyMac acceptable
information to permit verification of your income, and make the payments shown in the
payment schedule in paragraph 5 of this Agreement, while IndyMac verifies your information.
If you qualify, IndyMac, will sign and return this Agreement to you, and it will be effective on
the date it is signed by IndyMac. If you do not make all payments when due while we verify
that you qualify, or if you do not qualify, your Note will not be modified. IndyMac will apply
any payments you made to the amounts you owe.

2. The unpaid principal balance of your Note as of the date of this Agreement, before
modification, is $563,988.51.

3. The Note and the Security Instrument are modified to increase the principal balance of the Note by the amounts of your arrears on the Note of $13,763.05, including past due interest in the amount of $10,192.35, past due Escrow Items totaling $3,125.70 and servicing costs totaling $445.00. The new principal amount of the Note is $597,721.56. All unpaid late charges have been waived. There are no fees or other charges assessed for the modification.

4. We agree that any portion of Escrow Items that we add to the unpaid Principal Balance which creates a surplus in your escrow account will not be secured by the real property described in the Security Instrument, but is included in the Principal Balance that you must repay as provided in this Agreement.

5. Future payments will be based on the interest rate specified in the Note. If the Note provides for periodic adjustments to the interest and/or payments, those adjustments will occur as specified in the Note.

| Interest Paid to Date | Interest Rate | Payment Due Date | Monthly P&I |
|---|---|---|---|
| 5/1/2010 | 5.125% | 6/1/2010 | $3,400.26 |

6. Your monthly payment stated in your Note will change effective with the payment due on 6/1/2010. This monthly payment will consist of principal and interest, and will continue until the Maturity Date. This monthly payment will change as shown in paragraph 5 above.

7. The Note Holder will send you notice of these changes.

8. The Maturity Date stated in your Note does not change; the Maturity Date remains 7/1/2037.

9. ☐ If box is checked, a Post-Chapter 7 Rider to Modification Agreement ("Rider") is attached to this Agreement. The Rider is incorporated into this Agreement with the same effect as if the Rider had been included directly into the body of this Agreement.

10. The monthly payments for principal and interest, stated above, do not include required payments for taxes and insurance, which may be substantial. Your monthly requirements for taxes and insurance will change periodically during the term of your mortgage.

11. Your Security Instrument will continue to secure payment and performance of the Note as amended by this Agreement.

12. Except as modified by this Agreement, all terms and provisions of the Note, any Riders, and the Security Instrument remain in full force and effect.

13. The Note and Security Instrument are duly valid, binding agreements, enforceable in accordance with their terms, and are hereby reaffirmed.

Lender: INDYMAC MORTGAGE

By: _____  U/B/D
                                Date
Wendy Traxler, First Vice President

I/We agree to the modification of my/our Loan as described above.

_____  05/28/10        _____ 05/28/10
Gladstone C Mcalmon        Date            Deena Mcalmon              Date

_____  5/28/10          _____  5/28/10
Witness                    Date           Witness                    Date

                    _____
                    Wendy Traxler, First Vice President

Mortgage Electronic Registration
Systems, Inc. - Nominee for Lender

Notarize on Back

## Notary Section

STATE OF NEW YORK )
                                     ) ss.:
COUNTY OF KINGS )

On the _28_ day of _MAY_ _____ in the year _2010_ before me, the undersigned, a Notary Public in and for said State, personally appeared _Gladstone C. McAlmon_ & _De ana m. mcAlmon_

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

_____
Notary Signature

_Laura M. Talavera_
Notary Printed Name

Notary Public; State of _New York_
Qualified in the County of _King_
My commission expires: _12/1/2013_
Official Seal:

LAURA M. TALAVERA
Notary Public, State of New York
No. 01TA6218040
Qualified in Richmond County
Commission Expires 12/17/2013

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2011110701190001001EF172

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 3 |
|---|---|

**Document ID:** 2011110701190001        Document Date: 10-21-2011        Preparation Date: 11-07-2011
**Document Type:** ASSIGNMENT, MORTGAGE
Document Page Count: 1

| PRESENTER: | RETURN TO: |
|---|---|
| VENTURE TITLE AGENCY(REDVISION PICK UP) | MCCABE,WEISBERG&CONWAY,P.C. |
| 501 WEST MAIN STREET | 145 HUGUENOT STREET |
| PATCHOGUE, NY 11772 | SUITE 499 |
| 631-758-1180 | NEW ROCHELLE, NY 10801 |
| ipovinelli@venturetitleagency.com | |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 8212 | 29 | Entire Lot | 941 E. 104TH STREET |

Property Type: DWELLING ONLY - 1 FAMILY

**CROSS REFERENCE DATA**

CRFN: 2007000375473

**PARTIES**

| ASSIGNOR/OLD LENDER: | ASSIGNEE/NEW LENDER: |
|---|---|
| MERS | ONEWEST BANK, FSB |
| 1901 EAST VOORHEES STREET, SUITE C | 888 EAST WALNUT STREET |
| DANVILLE, IL 61834 | PASADENA, CA 91101 |

x   Additional Parties Listed on Continuation Page

**FEES AND TAXES**

| Mortgage | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** | |
| NYCTA: | $ | 0.00 | Recorded/Filed     11-18-2011 12:04 | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | |
| TOTAL: | $ | 0.00 | 2011000402728 | |
| Recording Fee: | $ | 42.00 | | |
| Affidavit Fee: | $ | 0.00 | *Janette M Lill* | |

*City Register Official Signature*

NYC DEPARTMENT OF FINANCE
OFFICE OF THE CITY REGISTER



2011110701190001001CF3F2

RECORDING AND ENDORSEMENT COVER PAGE (CONTINUATION)          PAGE 2 OF 3

Document ID: 2011110701190001          Document Date: 10-21-2011          Preparation Date: 11-07-2011
Document Type: ASSIGNMENT, MORTGAGE

PARTIES
ASSIGNOR/OLD LENDER:
INDYMAC BANK, F.S.B.
1901 EAST VOOHEERS STREET, SUITE C
DANVILLE, IL 61834

**Prepared By:**
OneWest Bank
Attn: John P. Gagnon (T/U
2900 Esperanza Xing, 4th Floor
Austin, TX 78758
(512) 808-8031

**After Recording Return To:**
Lisa Watson, Esq.
McCabe, Weisberg, Conway, P.C.
123 South Broad Street Suite 2080
Philadelphia, PA 19109

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

OneWest Bank Loan #:                                                              Tax Map #: K08232-00029
MIN #:                                                                            MERS Phone:

## New York Assignment of Mortgage

KNOW ALL MEN BY THESE PRESENTS That Mortgage Electronic Registration Systems, Inc. (MERS), solely as nominee for IndyMac Bank, F.S.B., a federally chartered savings bank, whose address is 1901 East Voorhees Street, Suite C, Danville, IL 61834, as Mortgagee or prior Assignee under that certain MORTGAGE dated June 25, 2007 executed by Gladstone C. McAlmon and Deanna McAlmon His Wife to beneficiary under Mortgage, Mortgage Electronic Registration Systems, Inc. (MERS), solely as nominee for IndyMac Bank, F.S.B., a federally chartered savings bank, and recorded on July 26, 2007, in Book _____ Volume or Liber , Page(s) _____, and as Mortgage # 2007000375473, of the Records of Kings County, State of New York, given to secure the payment of a promissory note for the sum of $552,500.00 and interest, has endorsed said note and does hereby ASSIGN AND TRANSFER to OneWest Bank, FSB whose address is 888 East Walnut Street, Pasadena, CA 91101 all right, title and interest in said note and all rights accrued under said Mortgage and all indebtedness secured thereby. The said Mortgage described herein affects the premises commonly known and designated as:

941 E. 104th Street
Brooklyn, New York 11236

This assignment is not subject to the requirements of Section 275 of the Real Property Law because it is an assignment within the secondary mortgage market. '

DATED: October 21, 2011                   MORTGAGE ELECTRONIC REGISTRATION
                                          SYSTEMS, INC. (MERS) solely as nominee for IndyMac
                                          Bank, F.S.B., a federally chartered savings bank

                                          WENDY TRAXLER
                                          Assistant Secretary

STATE OF       TEXAS          §
COUNTY OF      TRAVIS         §

On October 21, 2011, before me, Camiel Watson, Notary Public, the undersigned, personally appeared, Wendy Traxler, Assistant Secretary, personally known to me to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned.

CAMIEL WATSON, Notary Public


CAMIEL WATSON
Notary Public, State of Texas
My Commission Expires
November 26, 2013

My Commission Expires: November 25, 2013

SEAL

Investor Loan #:                                    Reference #:

After Recording Return To:
IndyMac Mortgage Services
Mailcode: IndyMac-12
2900 Esperanza Crossing
Austin, TX 78758

This document was prepared by _____

_____[Space Above This Line For Recording Data]_____

# HOME AFFORDABLE MODIFICATION AGREEMENT

Borrower ("I"):[1] Gladstone C Mcalmon and Deana Mcalmon
Lender or Servicer ("Lender"): IndyMac Mortgage Services
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): 6/25/2007
Loan Number:
Property Address ("Property"): 941 194th St, Brooklyn, NY 11236

Recorded on 6/25/2007 in Book or Liber _____ at page(s) _____, or Instrument or Document
No. 2007071301 of the official records of Kings, New York. If my representations and covenants in
Section 1 continue to be true in all material respects, then this Home Affordable Modification Agreement
("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage on the Property,
and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously
have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement
and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send
me a signed copy of this Agreement. This Agreement will not take effect unless the preconditions set
forth in Section 2 have been satisfied.

---

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words
signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

HOME AFFORDABLE MODIFICATION AGREEMENT - Non-GSE (PRA).

3129 (rev. 10/10) (page 1 of 9 pages)

Reference #:

1. **My Representations.** I certify, represent to Lender and agree:

   A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

   B. One of the borrowers signing this Agreement lives in the Property as a principal residence, and the Property has not been condemned.

   C. There is no impermissible change in the ownership of the Property since I signed the Loan Documents. A permissible change would be any transfer that the lender is required by law to allow, such as a transfer to add or remove a family member, spouse or domestic partner of the undersigned in the event of a death, divorce or marriage;

   D. I have provided documentation for all income that I receive (and I understand that I am not required to disclose child support or alimony unless I chose to rely on such income when requesting to qualify for the Home Affordable Modification program ("Program"));

   E. Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement, including the documents and information regarding my eligibility for the Program, are true and correct;

   F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and

   G. I have made or will make all payments required under a Trial Period Plan.

2. **Acknowledgements and Preconditions to Modification.** I understand and acknowledge that:

   A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any of my representations in Section 1 are no longer true and correct or any covenant in Section 1 has not been performed, the Loan Documents will not be modified and this Agreement will terminate. In that event, the Lender will have all of the rights and remedies provided by the Loan Documents; and

   B. I understand that the Loan Documents will not be modified unless and until (i) the Lender accepts this Agreement by signing and returning a copy of it to me, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

3. **The Modification.** If my representations and covenants in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 2/1/2015 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on 2/1/2015.

   A. The new Maturity Date will be: 7/1/2037.

Reference #:

B. The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amounts") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be $760,341.96 (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C. $242,841.96 of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and will be treated as a non-interest bearing principal forbearance. I will not pay interest or make monthly payments on the Deferred Principal Balance. In addition, $242,841.96 of the Deferred Principal Balance is eligible for forgiveness (the "Deferred Principal Reduction Amount"). Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of 11/1/2014, the Lender shall reduce the Deferred Principal Balance of my Note in installments equal to one-third of the Deferred Principal Reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $517,500.00.Interest at the rate of 3.37500% will begin to accrue on the Interest Bearing Principal Balance as of 1/1/2015 and the first new monthly payment on the Interest Bearing Principal Balance will be due on 2/1/2015. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|------------------------------------------|------------------------|-------------------|----------------------------|
| 1-5 | 3.37500% | 1/1/2015 | $2,738.20 | $638.33, may adjust periodically | $3,376.53, may adjust periodically | 2/1/2015 | 60 |
| 6-23 | 3.87500% | 1/1/2020 | $2,347.82 | May adjust periodically | May adjust periodically | 2/1/2020 | 210 |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

Reference #:

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable, step or simple interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan. My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

I further understand that, provided I am not in default under the terms of this Agreement and I pay my Note in full (i) any time more than 30 calendar days after the Modification Effective Date, and (ii) prior to the application of the entire Deferred Principal Reduction Amount, I shall be fully vested in and entitled to the unapplied amount of the Deferred Principal Reduction Amount and the unapplied amount shall be deducted from my payoff balance.

D. I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E. If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

F. I agree to pay in full the Deferred Principal Balance and any other amounts still owed under the Loan Documents by the earliest of: (i) the date I sell or transfer an interest in the Property, (ii) the date I pay the entire Interest Bearing Principal Balance, or (iii) the new Maturity Date.

4. Additional Agreements. I agree to the following:

A. That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

Reference #:

B. That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan or Workout Plan that I previously entered into with Lender.

C. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D. Funds for Escrow Items. I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D. I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

Reference #:

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E. That the Loan Documents as modified by this Agreement are duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, if all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

Reference #:

H. That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I. That, as of the Modification Effective Date, if any provision in the Note or in any addendum or amendment to the Note allowed for the assessment of a penalty for full or partial prepayment of the Note, such provision is null and void.

J. That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K. That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. I understand that a corrected Agreement or a letter agreement containing the correction will be provided to me for my signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L. Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M. That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s);(d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program, and (e) any HUD certified housing counselor.

Reference #:

N. I agree that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. If the Note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the Note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

O. That the mortgage insurance premiums on my Loan, if applicable, may increase as a result of the capitalization which will result in a higher total monthly payment. Furthermore, the date on which I may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

In Witness Whereof, the Lender and I have executed this Agreement.
Indymac Mortgage Services, a division of OneWest Bank N.A.

Lender

By: _____
Mike Stanford, First Vice President

Date

Gladstone C. Mcalmon
Date  12  23  14

Deana Mcalmon
Date  12  23  14

_____[Space Below This Line For Acknowledgement]_____

HOME AFFORDABLE MODIFICATION AGREEMENT - Non-GSE (PRA).

3/09 (rev. 10/10) (page 8 of 9 pages)

## Notary Section

STATE OF NEW YORK                      )
                                       ) ss.:
COUNTY OF KINGS                        )

On the _23_ day of _December_ _____ in the year _2018_ before me, the
undersigned, a Notary Public in and for said State, personally appeared _____
_Gladstone McAlmon_ _and_ _Henny Mcalmon_

personally known to me or proved to me on the basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s)
acted, executed the instrument.

Notary Signature
_Ndukwe Agwu_
Notary Printed Name

Notary Public; State of _____
Qualified in the County of _____
My commission expires: _____
Official Seal:

Ndukwe Agwu
Notary Public
State of New York
Registration# 02AG6184079
Commission Expires 03/31/20_16_

1/9 9Ebou-30003 19/143

# EXHIBIT "B"

# RESIDENTIAL APPRAISAL REPORT



## Prestige Appraisals

| | |
|---|---|
| Property Location: | 941 E 104th St<br>BLK: 8212  LOT: 29<br>Brooklyn, NY 11236 |
| Borrower: | N/A |
| Client: | DEANA MCALMON<br>941 E. 104TH STREET<br>BROOKLYN , NY 11236 |
| Effective Date: | 07/06/2019 |
| Prepared By: | JESSE ZUCKERMAN \ PRESTIGE APPRAISALS INC |



Prestige Appraisals

# 2-4 UNIT RESIDENTIAL APPRAISAL SUMMARY REF

File No.: PA 14036

## SUBJECT

| | |
|---|---|
| Property Address: 941 E 104th St | City Brooklyn | State: NY | Zip Code: 11236 |
| County: QUEENS | Legal Description: BLK: 8212 LOT: 29 |

Assessor's Parcel #: 3082120029    Tax Year: 2018    R.E. Taxes: $ 5,030    Special Assessments: $ N/A

Current Owner of Record: DEANA MCALMON    Borrower (if applicable): N/A

Occupant: ☒ Owner ☐ Tenant ☐ Vacant   Project Type: ☐ PUD ☐ Other (describe)    HOA: $   ☐ per yr. ☐ per mo.

Market Area Name: CANARSIE    Map Reference: HAGSTROM    Census Tract 0986.00

The purpose of this appraisal is to develop an opinion of: ☒ Market Value (as defined), or ☐ other type of value (describe)

This report reflects the following value (if not Current, see comments): ☒ Current (the Inspection Date is the Effective Date) ☐ Retrospective ☐ Prospective

## ASSIGNMENT

Approaches developed for this appraisal: ☒ Sales Comparison Approach ☐ Cost Approach ☐ Income Approach (See Reconciliation Comments and Scope of Work)

Property Rights Appraised: ☒ Fee Simple ☐ Leasehold ☐ Leased Fee ☐ Other (describe)

Intended Use: ESTIMATE OF VALUE AS OF 07/06/2019

Intended User(s) (by name or type): DEANA MCALMON

Client: PRIVATE    Address: 941 E. 104TH STREET , BROOKLYN , NY 11236

Appraiser: JESSE ZUCKERMAN/ PRESTIGE APPRAISALS INC.    Address: 184 HICKORY LANE SMITHTOWN, NY 11787

## MARKET AREA DESCRIPTION

| Location: | ☒ Urban | ☐ Suburban | ☐ Rural | Predominant Occupancy | | 2 – 4 Unit Housing | | Present Land Use | | Change in Land Use | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Built up: | ☒ Over 75% | ☐ 25-75% | ☐ Under 25% | PRICE | AGE | One-Unit | 70 % | ☒ Not Likely | |
| Growth rate: | ☐ Rapid | ☒ Stable | ☐ Slow | ☒ Owner 55 | $(000) | (yrs) | 2-4 Unit | 20 % | ☐ Likely * | ☐ In Process * |
| Property values: | ☐ Increasing | ☒ Stable | ☐ Declining | ☒ Tenant 40 | 20 Low NEW | | Multi-Unit | 5 % | * To | |
| Demand/supply: | ☐ Shortage | ☒ In Balance | ☐ Over Supply | ☐ Vacant (0-5%) 959 | High 125+ | | Commi | 5 % | | |
| Marketing time: | ☐ Under 3 Mos. | ☒ 3-6 Mos. | ☐ Over 6 Mos. | ☒ Vacant (>5%) 705 | Pred 75 | | | % | | |

Market Area Boundaries, Description, and Market Conditions (including support for the above characteristics and trends): THE SUBJECT IS LOCATED IN
BROOKLYN , AN URBAN NEIGHBORHOOD CONSISTING OF HOMES VARYING IN STYLE, SIZE AND AGE. HOMES ARE IN
GENERALLY MAINTAINED CONDITION WITH AVERAGE CARED FOR LANDSCAPING. PROPERTY IS CONVENIENT TO ALL
EXPECTED AMENITIES. PROPERTY VALUES HAVE REMAINED STABLE. DEMAND AND SUPPLY APPEAR TO BE BALANCED.
AVERAGE MARKETING TIME IS 3 - 6 MONTHS. CURRENT MORTGAGE MARKET OFFERS A WIDE VARIETY OF LOANS WITH
COMPETITIVE RATES. TERMS OF FINANCING HAVE HAD LITTLE IMPACT ON SALES PRICES IN THE MARKET AREA.

## SITE DESCRIPTION

Dimensions: 25X100 (SUBJECT TO SURVEY)    Site Area: 2,500 Sq.Ft.

Zoning Classification: R5B    Description: LOW DENSITY RESIDENTIAL

Zoning Compliance: ☒ Legal ☐ Legal nonconforming (grandfathered) ☐ Illegal ☐ No zoning

Are CC&Rs applicable? ☐ Yes ☒ No ☐ Unknown   Have the documents been reviewed? ☐ Yes ☐ No   Ground Rent (if applicable) $ /

Comments:

Highest & Best Use as improved ☒ Present use, or ☐ Other use (explain)

Actual Use as of Effective Date: 2 FAMILY RESIDENTIAL    Use as appraised in this report: 2 FAMILY RESIDENTIAL

Summary of Highest & Best Use: THE HIGHEST & BEST USE IS THE PRESENT USE.

| Utilities | Public | Other | Provider/Description | Off-site improvements | Type | Public | Private | Frontage | 25 FEET |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | 100 X 2 AMPS | Street | ASPHALT | ☒ | ☐ | Topography | FLAT |
| Gas | ☒ | ☐ | GAS | Width | N/A | | | Size | AVERAGE |
| Water | ☒ | ☐ | CITY | Surface | MACADAM | | | Shape | REGULAR |
| Sanitary Sewer | ☒ | ☐ | SEWER | Curb/Gutter | CONCRETE | ☒ | ☐ | Drainage | ADEQUATE |
| Storm Sewer | ☒ | ☐ | N/A | Sidewalk | CONCRETE | ☒ | ☐ | View | AVERAGE |
| Telephone | ☐ | ☐ | N/A | Street Lights | PUBLIC | ☒ | ☐ | | |
| Multimedia | ☐ | ☐ | N/A | Alley | NONE | | | | |

Other site elements: ☒ Inside Lot ☐ Corner Lot ☐ Cul de Sac ☐ Underground Utilities ☐ Other (describe)

FEMA Special Flood Hazard Area: ☐ Yes ☒ No FEMA Flood Zone: X    FEMA Map #: 3604970219F    FEMA Map Date: 09/05/2007

Site Comments: THERE WERE NO ADVERSE ENVIRONMENTAL CONDITIONS, ENCROACHMENTS OR EASEMENTS.

## DESCRIPTION OF THE IMPROVEMENTS

| General Description | | Exterior Description | | Foundation | | Basement | ☐ None | Heating | |
|---|---|---|---|---|---|---|---|---|---|
| # of Units | 2 ☐ Accessory Unit | Foundation | CONCRETE/AV | Slab | 0% | Area Sq. Ft. | 800 | Type | STM |
| # Stories | 2   # Bldgs 1 | Exterior Walls | BRICK/AVG | Crawl Space | 0% | % Finished | 85 | Fuel | GAS |
| Type ☐ Det. ☐ Att. ☒ S/Att | | Roof Surface | FLAT/AVG | Basement | 100% | Ceiling | SR | | |
| Design (Style) COL/SAT | | Gutters & Dwnspts. | ALUM/NUM/AV | Sump Pump | ☐ | Walls | SR | Cooling | |
| ☒ Existing ☐ Proposed ☐ Und.Const. | | Window Type | DH/GD | Dampness | ☐ | Floor | VINYL | ☐ Central | |
| Actual Age (Yrs.) 89 | | Storm/Screens | YES/GD | Settlement | NONE | Outside Entry | YES | ☐ Other | IND UNIT |
| Effective Age (Yrs.) 20 | | | | Infestation | NONE | | | | |

| Interior Description | | Appliances | # | Attic | ☒ None | Amenities | | Car Storage | | ☐ None |
|---|---|---|---|---|---|---|---|---|---|---|
| Floors | WOOD/CPT/AVG | Refrigerator | 2 | Stairs | | Fireplace(s) # | 0 | Woodstove(s) # | Garage | # of cars 1 2 Tot. |
| Walls | SHEETROCK/AVG | Range/Oven | 2 | Drop Stair | | Patio | PATIO | | Attach. 0 | |
| Trim/Finish | WOOD/AVG | Disposal | 0 | Scuttle | | Deck | NONE | | Detach. 0 | |
| Bath Floor | CERAMIC/AVG | Dishwasher | 0 | Doorway | | Porch | NONE | | Blt.-In 0 | |
| Bath Wainscot. | CERAMIC/AVG | Fan/Hood | 0 | Floor | | Fence | FENCE | | Carport 0 | |
| Doors | WOOD/AVG | Microwave | 0 | Heated | | Pool | NONE | | Driveway 2 | |
| | | Washer/Dryer | 0 | Finished | | | | | Surface CONCRETE | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Unit # 1 contains: | 4 Rooms; | 2 Bedrooms; | 1 Bath(s); | 800 | Sq.Ft. GLA Above Grade | | The Total Gross Building Area |
| Unit # 2 contains: | 5 Rooms; | 2 Bedrooms; | 1 Bath(s); | 800 | Sq.Ft. GLA Above Grade | | for the Subject Property is: |
| Unit # 3 contains: | Rooms; | Bedrooms; | Bath(s); | | Sq.Ft. GLA Above Grade | | 1,600 Sq.Ft. |
| Unit # 4 contains: | Rooms; | Bedrooms; | Bath(s); | | Sq.Ft. GLA Above Grade | | |

Copyright 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP 2-4 UNIT**    Form GP2-4 – "TOTAL" appraisal software by a la mode, inc. – 1-800-ALAMODE    4/2007

# 2-4 UNIT RESIDENTIAL APPRAISAL SUMMARY REF File No.: PA 14036

**IMPROVEMENTS (cont.)**

Additional features: THE SUBJECT HAS THERMOPANE WINDOWS, PATIO, FENCE AND A FULL FINISHED BASEMENT.

Describe the condition of the property (including physical, functional and external obsolescence): THE SUBJECT IS MAINTAINED IN AVERAGE CONDITION. THIS IS TYPICAL OF HOMES OF THIS TYPE. PHYSICAL DEPRECIATION IS BASED ON NORMAL WEAR AND TEAR OF A BUILDING OF THIS AGE. NO EXTERNAL OBS. WAS NOTED. NO FUNCTIONAL OBSOLESCENCE NOTED.

**COMPARABLE RENTAL ANALYSIS**

The following properties are representative current, similar, and proximate rental properties comparable to the subject property. This analysis is intended to support the opinion of the market rent for the subject property.

| FEATURE | SUBJECT | COMPARABLE RENTAL # 1 | COMPARABLE RENTAL # 2 | COMPARABLE RENTAL # 3 |
|---|---|---|---|---|
| Address | 941 E. 104TH STREET | | | |
| | BROOKLYN, NY 11236 | | | |
| Proximity to Subject | | | | |
| Current Monthly Rent | $ N/A | $ | $ | $ |
| Less: Utilities | -$ | -$ | -$ | -$ |
| Furnishings | -$ | -$ | -$ | -$ |
| Plus: Rent Concess. | +$ | +$ | +$ | +$ |
| Adj. Monthly Rent | $ | $ | $ | $ |
| Adj. Mo. Rent / GLA | $ /sq.ft. | $ /sq.ft. | $ /sq.ft. | $ /sq.ft. |
| Data Source(s) | | | | |

| RENT ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +/- $ Adjust | DESCRIPTION | +/- $ Adjust | DESCRIPTION | +/- $ Adjust |
|---|---|---|---|---|---|---|---|
| Rent Control | Yes X No | Yes No | | Yes No | | Yes No | |
| Lease Date | | | | | | | |
| Location | URBAN | | | | | | |
| Design (Style) | COL/SAT | | | | | | |
| Age | 89 | | | | | | |
| Condition | AVERAGE | | | | | | |
| Total GBA | 1,600 sq.ft. | sq.ft. | | sq.ft. | | sq.ft. | |
| Total # of Units | 2 | | | | | | |
| Total GLA | 1,600 sq.ft. | sq.ft. | | sq.ft. | | sq.ft. | |
| Unit Breakdown | Tot. Bed. Baths GLA | Tot. Bed. Baths GLA | | Tot. Bed Baths GLA | | Tot. Bed Baths GLA | |
| Unit # 1 | 4 2 1 800 | | | | | | |
| Unit # 2 | 5 2 1 800 | | | | | | |
| Unit # 3 | | | | | | | |
| Unit # 4 | | | | | | | |
| Net Rental Adjustment (Total) | | + – $ | | + – $ | | + – $ | |
| Indicated Monthly Market Rent | | $ | | $ | | $ | |

Analysis of rental data:

**SUBJECT RENT SCHEDULE**

Rent Schedule: The appraiser must reconcile the applicable indicated monthly market rents to provide an opinion of the market rent for each unit in the subject property.

| | Leases | | Actual Rents | | | Opinion of Market Rent | | |
|---|---|---|---|---|---|---|---|---|
| | | Lease Dates | Per Unit | | Total | Per Unit | | Total |
| Unit # | Begin Date | End Date | Unfurnished | Furnished | Rents | Unfurnished | Furnished | Rents |
| 1 | | | $ | $ | $ | $ | $ | $ |
| 2 | | | $ | $ | $ | $ | $ | $ |
| 3 | | | $ | $ | $ | $ | $ | $ |
| 4 | | | $ | $ | $ | $ | $ | $ |

Comments on lease data

| | | |
|---|---|---|
| Total Actual Monthly Rent | $ | Total Gross Monthly Rent | $ |
| Other Monthly Income (itemize) | $ | Other Monthly Income (itemize) | $ |
| Total Annual Monthly Income | $ | Total Estimated Monthly Income | $ |

Utilities included in estimated rents: Electric  Water  Sewer  Gas  Oil  Trash collection  Multimedia  Telephone  Other

Comments on actual or estimated rents and other monthly income (including personal property)

**INCOME APPROACH**

INCOME APPROACH TO VALUE   X The Income Approach was not developed for this appraisal.

Gross Rent Multiplier Analysis:

| Address | Date | Sale Price | Gross Rent | GRM | Comments |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

Opinion of Monthly Market Rent $_____ X Gross Rent Multiplier _____ = $_____     Indicated Value by Income Approach $_____

Summary of Income Approach (including support for market rent and GRM):

**GP** **2-4 UNIT**

Copyright 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode inc. must be acknowledged and credited.

# 2-4 UNIT RESIDENTIAL APPRAISAL SUMMARY REF
File No.: PA 14036

**TRANSFER HISTORY**

| Data Source(s): | GEODATA | | |
|---|---|---|---|
| | | My research | did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal. |
| 1st Prior Subject Sale/Transfer | | Analysis of sale/transfer history and/or any current agreement of sale/listing: | THERE ARE NO OTHER KNOWN |
| Date: | N/A | LISTINGS OF THE SUBJECT WITHIN THE PAST 12 MONTHS ACCORDING TO MLS. | |
| Price: | N/A | | |
| Source(s): | GEODATA | | |
| 2nd Prior Subject Sale/Transfer | | | |
| Date: | | | |
| Price: | | | |
| Source(s): | | | |

## SALES COMPARISON APPROACH TO VALUE (if developed)
The Sales Comparison Approach was not developed for this appraisal.

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 941 E. 104TH STREET | 1407 E. 99TH STREET | | 1003 E. 103RD STREET | | 928 E. 105TH STREET | |
| | BROOKLYN, NY 11236 | BROOKLYN, NY 11236 | | BROOKLYN, NY 11236 | | BROOKLYN, NY 11236 | |
| Proximity to Subject | | 0.73 miles SE | | 0.10 miles S | | 0.04 miles NE | |
| Sale Price | $ 0 | $ 610,000 | | $ 577,349 | | $ 659,000 | |
| Sale Price/GBA | $ 0.00 /sq.ft. | $ 391.03 /sq.ft. | | $ 328.04 /sq.ft. | | $ 345.57 /sq.ft. | |
| Gross Monthly Rent | $ 0 | $ 0 | | $ 0 | | $ 0 | |
| Gross Rent Multiplier | 0.00 | | | | | | |
| Price per Unit | $ 675,000 | $ 305,000 | | $ 288,675 | | $ 329,500 | |
| Price per Room | $ 225.000 | $ 67,778 | | $ 72,169 | | $ 65,900 | |
| Price per Bedroom | $ 337,500 | $ 203,333 | | $ 144,337 | | $ 164,750 | |
| Data Source(s) | PUB. RECORD | STREETEASY#0 | | STREETEASY#0 | | STREETEASY#0 | |
| Verification Source(s) | INSPECTION | GEODATA/CLOSED | | GEODATA/CLOSED | | GEODATA/CLOSED | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +/– $ Adjust | DESCRIPTION | +/– $ Adjust | DESCRIPTION | +/– $ Adjust |
| Rent Control | Yes ☒ No | Yes ☒ No | | Yes ☒ No | | Yes ☒ No | |
| Sales or Financing | N/A | UNKNOWN | | UNKNOWN | | UNKNOWN | |
| Concessions | N/A | NONE KNOWN | | NONE KNOWN | | NONE KNOWN | |
| Date of Sale/Time | N/A | 06/05/2019 | | 11/20/2018 | | 04/22/2019 | |
| Rights Appraised | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Location | URBAN | URBAN | | BUSY ROAD | +15,000 | BUSY ROAD | +15,000 |
| Site | 2,500 SF | 2,000 SF | | 2,069 SF | | 2,000 SF | |
| View | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Design (Style) | COL/SAT | COL/ATT | | COL/SAT | | COL/ATT | +20,000 |
| Quality of Construction | BRICK | BRICK | +20,000 | BRICK | | BRICK | |
| Age | 89 | 89 | | 64 | | 64 | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | GOOD | –35,000 |
| Total GBA | 1,600 sq.ft. | 1,560 sq.ft. | | 1,760 sq.ft. | | 1,907 sq.ft. | |
| Total # of Units | 2 | 2 | | 2 | | 2 | |
| Total GLA | 1,600 sq.ft. | 1,560 sq.ft. | 0 | 1,760 sq.ft. | –8,000 | 1,907 sq.ft. | –15,500 |

| Unit Breakdown | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit # 1 | 4 | 2 | 1 | 4 | 1 | 1 | 4 | 2 | 1 | 5 | 2 | 1 |
| Unit # 2 | 5 | 2 | 1 | 5 | 2 | 1 | 4 | 2 | 1 | 5 | 2 | 1 |
| Unit # 3 | | | | | | | | | | | | |
| Unit # 4 | | | | | | | | | | | | |

| | SUBJECT | COMP 1 | | COMP 2 | | COMP 3 | |
|---|---|---|---|---|---|---|---|
| Basement & Finished | FULL | FULL | | FULL | | FULL | |
| Rooms Below Grade | FINISHED | FINISHED | | FINISHED | | FINISHED | |
| Functional Utility | 2 FAMILY | 2 FAMILY | | 2 FAMILY | | 2 FAMILY | |
| Heating/Cooling | ADEQ/NONE | ADEQ/NONE | | ADEQ/NONE | | ADEQ/NONE | |
| Energy Efficient Items | THERMOPANE | THERMOPANE | | P-THERMOS | +5,000 | THERMOPANE | |
| Parking | DRIVEWAY | 1-CAR-GAR | –8,000 | DRIVEWAY | | DRIVEWAY | |
| Porch/Patio/Deck | PATIO | PORCH | | BALCONY | | PATIO | |

| Net Adjustment (Total) | | ☒ + – | $ 12,000 | ☒ + – | $ 12,000 | + ☒ – | $ –15,500 |
|---|---|---|---|---|---|---|---|
| Adjusted Sale Price | | Net 2.0 % | | Net 2.1 % | | Net 2.4 % | |
| of Comparables | | Gross 4.6 % | $ 622,000 | Gross 4.8 % | $ 589,349 | Gross 13.0 % | $ 643,500 |
| Adjusted Price of Comparables per GBA | | $ 398.72 | | $ 334.86 | | $ 337.44 | |
| Adjusted Price of Comparables per Unit | | $ 311,000 | | $ 294,675 | | $ 321,750 | |
| Adjusted Price of Comparables per Room | | $ 69,111 | | $ 73,669 | | $ 64,350 | |
| Adjusted Price of Comparables per Bedroom | | $ 207,333 | | $ 147,337 | | $ 160,875 | |

| Ind. Val. per GBA | $ 256.25 X | 1,600 | SF GBA = $ | 410,000 | Ind. Val. per Unit | $ 307,500 X | 2 | Units = $ | 615,000 |
|---|---|---|---|---|---|---|---|---|---|
| Ind. Val. per Room | $ 68,333.33 X | 9 | Rooms = $ | 615,000 | Ind. Val. per Bedroom | $ 153,750 X | 4 | Bedrooms = $ | 615,000 |
| Summary of Sales Comparison Approach | SEE ADDENDUM | | | | | | | | |

Indicated Value by Sales Comparison Approach $ **615,000**

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP 2-4 UNIT**

Form GP2-4 – "TOTAL" appraisal software by a la mode, inc. – 1-800-ALAMODE    4/2007

# 2-4 UNIT RESIDENTIAL APPRAISAL SUMMARY REF

File No.: PA 14036

| COST APPROACH TO VALUE (if developed) | ☒ The Cost Approach was not developed for this appraisal. |
|---|---|

Provide adequate information for replication of the following cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value):

**COST APPROACH**

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | =$ |
|---|---|---|---|---|
| Source of cost data: | DWELLING | Sq.Ft. @ $ | | =$ |
| Quality rating from cost service:    Effective date of cost data: | | Sq.Ft. @ $ | | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | Sq.Ft. @ $ | | =$ |
| | | Sq.Ft. @ $ | | =$ |
| | | Sq.Ft. @ $ | | =$ |
| | | | | =$ |
| | Garage/Carport: | Sq.Ft. @ $ | | =$ |
| | Total Estimate of Cost-New | | | =$ |
| | Less    Physical    Functional    External | | | |
| | Depreciation | | | =$( |
| | Depreciated Cost of Improvements | | | =$ |
| | "As-is" Value of Site Improvements | | | =$ |
| | | | | =$ |
| | | | | =$ |
| Estimated Remaining Economic Life (if required):    Years | INDICATED VALUE BY COST APPROACH | | | =$ |

| PROJECT INFORMATION FOR PUDs (if applicable) | ☐ The Subject is part of a Planned Unit Development. |
|---|---|

Legal Name of Project:

Describe common elements and recreational facilities:

**PUD**

| Indicated Value by: Sales Comparison Approach $ | 615,000 | Income Approach $ | | Cost Approach (if developed) $ |
|---|---|---|---|---|

Final Reconciliation    CONSIDERING ALL THREE APPROACHES TO VALUE, PLACING THE MOST EMPHASIS ON THE MARKET
APPROACH, THE ESTIMATED MARKET VALUE IS $615,000.

**RECONCILIATION**

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a Hypothetical Condition that the repairs or alterations have been completed, ☐ subject to the following required inspection based on the Extraordinary Assumption that the condition or deficiency does not require alteration or repair:

☐ This report is also subject to other Hypothetical Conditions and/or Extraordinary Assumptions as specified in the attached addenda.

Based on the degree of inspection of the subject property, as indicated below, defined Scope of Work, Statement of Assumptions and Limiting Conditions, and Appraiser's Certifications, my (our) Opinion of the Market Value (or other specified value type), as defined herein, of the real property that is the subject of this report is: $    615,000    , as of:    07/06/2019    , which is the effective date of this appraisal. If indicated above, this Opinion of Value is subject to Hypothetical Conditions and/or Extraordinary Assumptions included in this report. See attached addenda.

A true and complete copy of this report contains    26    pages, including exhibits which are considered an integral part of the report. This appraisal report may not be properly understood without reference to the information contained in the complete report.

**ATTACHMENTS**

Attached Exhibits:    ☒ SCOPE OF WORK    ☐ LIMITING COND./CERTIFICATION    ☒ NARRATIVE ADDENDUM    ☒ PHOTOGRAPH ADDENDA
☒ SKETCH ADDENDUM    ☒ MAP ADDENDA    ☐ COST ADDENDUM    ☐ FLOOD ADDENDUM    ☒ ADDITIONAL SALES
☐ ADDITIONAL RENTALS    ☐ INCOME/EXPENSE ANALYSIS    ☐ HYPOTHETICAL CONDITIONS    ☐ EXTRAORDINARY ASSUMPTIO

| Client Contact:    N/a | | Client Name:    PRIVATE |
|---|---|---|
| E-Mail:    N/A | Address    941 E. 104TH STREET , BROOKLYN , NY 11236 | |

| APPRAISER | SUPERVISORY APPRAISER (if required) or CO-APPRAISER (if applicable) |
|---|---|

**SIGNATURES**

| Appraiser Name:    JESSE ZUCKERMAN PRESTIGE APPRAISALS INC | Supervisory or Co-Appraiser Name: |
|---|---|
| Company:    PRESTIGE APPRAISALS INC | Company: |
| Phone:    (917) 575-0362    Fax:  (631) 539-6478 | Phone:    Fax: |
| E-Mail:  JESSE4424@OPTONLINE.NET (EMAIL) | E-Mail: |
| Date of Report (Signature):    07/19/2019 | Date of Report (Signature): |
| License or Certification #:    45000048034    State:  NY | License or Certification #:    State: |
| Designation: | Designation: |
| Expiration Date of License or Certification    07/21/2019 | Expiration Date of License or Certification |
| Inspection of Subject:    ☒ Interior & Exterior    ☐ Exterior Only    ☐ None | Inspection of Subject:    ☐ Interior & Exterior    ☐ Exterior Only    ☐ None |
| Date of Inspection:    07/06/2019 | Date of Inspection: |

Copyright 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP 2-4 UNIT**    Form GP2-4 - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE    4/2007

# ADDITIONAL COMPARABLE SALES

File No.: PA 14236

| FEATURE | SUBJECT | | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|---|
| Address | 941 E. 104TH STREET | | 1029 E. 101ST STREET | | | | | |
| | BROOKLYN, NY 11236 | | BROOKLYN, NY 11236 | | | | | |
| Proximity to Subject | | | 0.20 miles S | | | | | |
| Sale Price | $ | 0 | | $ 610,849 | $ | | $ | |
| Sale Price/GBA | $ | 0.00 /sq.ft. | $ 424.20 /sq.ft. | | $ /sq.ft. | | $ /sq.ft. | |
| Gross Monthly Rent | $ | 0 | $ 0 | | $ | | $ | |
| Gross Rent Multiplier | | 0.00 | | | | | | |
| Price per Unit | $ | 575,000 | $ 305,425 | | $ | | $ | |
| Price per Room | $ | 225,000 | $ 50,904 | | $ | | $ | |
| Price per Bedroom | $ | 337,500 | $ 101,808 | | $ | | $ | |
| Data Source(s) | PUB. RECORD | | STREETEASY#0 | | | | | |
| Verification Source(s) | INSPECTION | | GEODATA/CLOSED | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | | DESCRIPTION | +/– $ Adjust | DESCRIPTION | +/– $ Adjust | DESCRIPTION | +/– $ Adjust |
| Rent Control | ☐ Yes ☒ No | | Yes ☒ No | | Yes ☐ No | | Yes ☐ No | |
| Sales or Financing | N/A | | UNKNOWN | | | | | |
| Concessions | N/A | | NONE KNOWN | | | | | |
| Date of Sale/Time | N/A | | 10/17/2018 | | | | | |
| Rights Appraised | FEE SIMPLE | | FEE SIMPLE | | | | | |
| Location | URBAN | | FRONTS PARK | +15,000 | | | | |
| Site | 2,500 SF | | 2,000 SF | | | | | |
| View | AVERAGE | | AVERAGE | | | | | |
| Design (Style) | COL/SAT | | COL/ATT | +20,000 | | | | |
| Quality of Construction | BRICK | | BRICK | | | | | |
| Age | 89 | | 59 | | | | | |
| Condition | AVERAGE | | GOOD | –35,000 | | | | |
| Total GBA | 1,600 sq.ft. | | 1,440 sq.ft. | | sq.ft. | | sq.ft. | |
| Total # of Units | 2 | | 2 | | | | | |
| Total GLA | 1,600 sq.ft. | | 1,440 sq.ft. | +8,000 | sq.ft. | | sq.ft. | |
| Unit Breakdown | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths |

| Unit Breakdown | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit # 1 | 4 | 2 | 1 | 6 | 3 | 1 | | | | | | |
| Unit # 2 | 5 | 2 | 1 | 6 | 3 | 1 | | | | | | |
| Unit # 3 | | | | | | | | | | | | |
| Unit # 4 | | | | | | | | | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Basement & Finished | FULL | | FULL | | | | | |
| Rooms Below Grade | FINISHED | | FINISHED | | | | | |
| Functional Utility | 2 FAMILY | | 2 FAMILY | | | | | |
| Heating/Cooling | ADEQ/NONE | | ADEQ/NONE | | | | | |
| Energy Efficient Items | THERMOPANE | | THERMOPANE | | | | | |
| Parking | DRIVEWAY | | DRIVEWAY | | | | | |
| Porch/Patio/Deck | PATIO | | PORCH | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Net Adjustment (Total) | | | ☒ + ☐ – | $ 8,000 | ☐ + ☐ – | $ | ☐ + ☐ – | $ |
| Adjusted Sale Price | | | Net 1.3 % | | Net % | | Net % | |
| of Comparables | | | Gross 12.8 % | $ 618,849 | Gross % | $ | Gross % | $ |
| Adjusted Price of Comparables per GBA | | | $ 429.76 | | $ | | $ | |
| Adjusted Price of Comparables per Unit | | | $ 309,425 | | $ | | $ | |
| Adjusted Price of Comparables per Room | | | $ 51,571 | | $ | | $ | |
| Adjusted Price of Comparables per Bedroom | | | $ 103,142 | | $ | | $ | |
| Summary of Sales Comparison Approach | | | SEE ADDENDUM | | | | | |

SALES COMPARISON APPROACH

GP 2-4 UNIT

Copyright 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GP2-4(AC) - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

4/2007

# ASSUMPTIONS, LIMITING CONDITIONS & SCOPE O

File No.: PA 14036

| Property Address: | 941 E 104th St | City: Brooklyn | State: NY | Zip Code: 11236 |
|---|---|---|---|---|
| Client | PRIVATE | Address | 941 E. 104TH STREET , BROOKLYN , NY 11236 | |
| Appraiser: | JESSE ZLIDKERMAN-PRESTIGE APPRAISAL'S INC. | Address | 184 HICKORY LANE SMITHTOWN, NY 11787 | |

**STATEMENT OF ASSUMPTIONS & LIMITING CONDITIONS**

- THE APPRAISER WILL NOT BE RESPONSIBLE FOR MATTERS OF A LEGAL NATURE THAT AFFECT EITHER THE PROPERTY BEING APPRAISED OR THE TITLE TO IT. THE APPRAISER ASSUMES THAT THE TITLE IS GOOD AND MARKETABLE AND, THEREFORE, WILL NOT RENDER ANY OPINIONS ABOUT THE TITLE. THE PROPERTY IS APPRAISED ON THE BASIS

OF IT BEING UNDER RESPONSIBLE OWNERSHIP. THE FUTURE OPERATION OF THE PROPERTY ASSUMES SKILLED AND ADEQUATE MANAGEMENT BUT ARE NOT REPRESENTED TO BE HISTORICALLY BASED.

- THE APPRAISER MAY HAVE PROVIDED A SKETCH IN THE APPRAISAL REPORT TO SHOW APPROXIMATE DIMENSIONS OF THE IMPROVEMENTS, AND ANY SUCH SKETCH IS INCLUDED ONLY TO ASSIST THE READER OF THE REPORT IN VISUALIZING THE PROPERTY AND UNDERSTANDING THE APPRAISER'S DETERMINATION OF ITS SIZE. UNLESS OTHERWISE INDICATED, A LAND SURVEY WAS NOT PERFORMED.

- IF SO INDICATED, THE APPRAISER HAS EXAMINED THE AVAILABLE FLOOD MAPS THAT ARE PROVIDED BY THE FEDERAL EMERGENCY MANAGEMENT AGENCY (OR OTHER DATA SOURCES) AND HAS NOTED IN THE APPRAISAL REPORT WHETHER THE SUBJECT SITE IS LOCATED IN AN IDENTIFIED SPECIAL FLOOD HAZARD AREA. BECAUSE THE APPRAISER IS NOT A SURVEYOR, HE OR SHE MAKES NO GUARANTEES, EXPRESS OR IMPLIED, REGARDING THIS DETERMINATION.

- THE APPRAISER WILL NOT GIVE TESTIMONY OR APPEAR IN COURT BECAUSE HE OR SHE MADE AN APPRAISAL OF THE PROPERTY IN QUESTION, UNLESS SPECIFIC ARRANGEMENTS TO DO SO HAVE BEEN MADE BEFOREHAND.

- IF THE COST APPROACH IS INCLUDED IN THIS APPRAISAL, THE APPRAISER HAS ESTIMATED THE VALUE OF THE LAND IN THE COST APPROACH AT ITS HIGHEST AND BEST USE, AND THE IMPROVEMENTS AT THEIR CONTRIBUTORY VALUE. THESE SEPARATE VALUATIONS OF THE LAND AND IMPROVEMENTS MUST NOT BE USED IN CONJUNCTION WITH ANY OTHER APPRAISAL AND ARE INVALID IF THEY ARE SO USED. UNLESS OTHERWISE SPECIFICALLY INDICATED, THE COST APPROACH VALUE IS NOT AN INSURANCE VALUE, AND SHOULD NOT BE USED AS SUCH.

- THE APPRAISER HAS NOTED IN THE APPRAISAL REPORT ANY ADVERSE CONDITIONS (INCLUDING, BUT NOT LIMITED TO, NEEDED REPAIRS, DEPRECIATION, THE PRESENCE OF HAZARDOUS WASTES, TOXIC SUBSTANCES, ETC.) OBSERVED DURING THE INSPECTION OF THE SUBJECT PROPERTY, OR THAT HE OR SHE BECAME AWARE OF DURING THE

NORMAL RESEARCH INVOLVED IN PERFORMING THE APPRAISAL. UNLESS OTHERWISE STATED IN THE APPRAISAL REPORT, THE APPRAISER HAS NO KNOWLEDGE OF ANY HIDDEN OR UNAPPARENT CONDITIONS OF THE PROPERTY, OR ADVERSE ENVIRONMENTAL CONDITIONS (INCLUDING, BUT NOT LIMITED TO, THE PRESENCE OF HAZARDOUS WASTES, TOXIC SUBSTANCES, ETC.) THAT WOULD MAKE THE PROPERTY MORE OR LESS VALUABLE, AND HAS ASSUMED THAT THERE ARE NO SUCH CONDITIONS AND MAKES NO GUARANTEES OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE CONDITION OF THE PROPERTY. THE APPRAISER WILL NOT BE RESPONSIBLE FOR ANY SUCH CONDITIONS THAT DO EXIST OR FOR ANY ENGINEERING OR TESTING THAT MIGHT BE REQUIRED TO DISCOVER WHETHER SUCH CONDITIONS EXIST. BECAUSE THE APPRAISER IS NOT AN EXPERT IN THE FIELD OF ENVIRONMENTAL HAZARDS, THE APPRAISAL REPORT MUST NOT BE CONSIDERED AS AN ENVIRONMENTAL ASSESSMENT OF

THE PROPERTY.

- THE APPRAISER OBTAINED THE INFORMATION, ESTIMATES, AND OPINIONS THAT WERE EXPRESSED IN THE APPRAISAL REPORT FROM SOURCES THAT HE OR SHE CONSIDERS TO BE RELIABLE AND BELIEVES THEM TO BE TRUE AND CORRECT. THE APPRAISER DOES NOT ASSUME RESPONSIBILITY FOR THE ACCURACY OF SUCH ITEMS THAT WERE FURNISHED BY OTHER PARTIES. ALL INFORMATION FURNISHED REGARDING RENTAL RATES, LEASE TERMS, OR PROJECTIONS OF INCOME AND EXPENSE IS FROM SOURCES DEEMED RELIABLE. NO WARRANTY OR REPRESENTATION IS MADE AS TO THE ACCURACY THEREOF.

- THE APPRAISER WILL NOT DISCLOSE THE CONTENTS OF THE APPRAISAL REPORT EXCEPT AS PROVIDED FOR IN THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE, AND ANY APPLICABLE FEDERAL, STATE OR LOCAL LAWS.

- IF THIS APPRAISAL IS INDICATED AS SUBJECT TO SATISFACTORY COMPLETION, REPAIRS, OR ALTERATIONS, THE APPRAISER HAS BASED HIS OR HER APPRAISAL REPORT AND VALUATION CONCLUSION ON THE ASSUMPTION THAT COMPLETION OF THE IMPROVEMENTS WILL BE PERFORMED IN A WORKMANLIKE MANNER.

- AN APPRAISER'S CLIENT IS THE PARTY (OR PARTIES) WHO ENGAGE AN APPRAISER IN A SPECIFIC ASSIGNMENT. ANY OTHER PARTY ACQUIRING THIS REPORT FROM THE CLIENT DOES NOT BECOME A PARTY TO THE APPRAISER-CLIENT RELATIONSHIP. ANY PERSONS RECEIVING THIS APPRAISAL REPORT BECAUSE OF DISCLOSURE REQUIREMENTS

APPLICABLE TO THE APPRAISER'S CLIENT DO NOT BECOME INTENDED USERS OF THIS REPORT UNLESS SPECIFICALLY IDENTIFIED BY THE CLIENT AT THE TIME OF THE ASSIGNMENT.

- THE APPRAISER'S WRITTEN CONSENT AND APPROVAL MUST BE OBTAINED BEFORE THIS APPRAISAL REPORT CAN BE CONVEYED BY ANYONE TO THE PUBLIC, THROUGH ADVERTISING, PUBLIC RELATIONS, NEWS, SALES, OR BY MEANS OF ANY OTHER MEDIA, OR BY ITS INCLUSION IN A PRIVATE OR PUBLIC DATABASE.

- AN APPRAISAL OF REAL PROPERTY IS NOT A HOME INSPECTION AND SHOULD NOT BE CONSTRUED AS SUCH. AS PART OF THE VALUATION PROCESS, THE APPRAISER PERFORMS A NON-INVASIVE VISUAL INVENTORY THAT IS NOT INTENDED TO REVEAL DEFECTS OR DETRIMENTAL CONDITIONS THAT ARE NOT READILY APPARENT. THE PRESENCE

OF SUCH CONDITIONS OR DEFECTS COULD ADVERSELY AFFECT THE APPRAISER'S OPINION OF VALUE. CLIENTS WITH CONCERNS ABOUT SUCH POTENTIAL NEGATIVE FACTORS

ARE ENCOURAGED TO ENGAGE THE APPROPRIATE TYPE OF EXPERT TO INVESTIGATE.

THE SCOPE OF WORK IS THE TYPE AND EXTENT OF RESEARCH AND ANALYSES PERFORMED IN AN APPRAISAL ASSIGNMENT THAT IS REQUIRED TO PRODUCE CREDIBLE ASSIGNMENT RESULTS. GIVEN THE NATURE OF THE APPRAISAL PROBLEM, THE SPECIFIC REQUIREMENTS OF THE INTENDED USER(S) AND THE INTENDED USE OF THE APPRAISAL REPORT. RELIANCE UPON THIS REPORT, REGARDLESS OF HOW ACQUIRED, BY ANY PARTY OR FOR ANY USE, OTHER THAN THOSE SPECIFIED IN THIS REPORT BY

THE APPRAISER, IS PROHIBITED. THE OPINION OF VALUE THAT IS THE CONCLUSION OF THIS REPORT IS CREDIBLE ONLY WITHIN THE CONTEXT OF THE SCOPE OF WORK, EFFECTIVE DATE, THE DATE OF REPORT, THE INTENDED USER(S), THE INTENDED USE, THE STATED ASSUMPTIONS AND LIMITING CONDITIONS, ANY HYPOTHETICAL CONDITIONS AND/OR EXTRAORDINARY ASSUMPTIONS, AND THE TYPE OF VALUE, AS DEFINED HEREIN. THE APPRAISER, APPRAISAL FIRM, AND RELATED PARTIES ASSUME NO OBLIGATION, LIABILITY, OR ACCOUNTABILITY, AND WILL NOT BE RESPONSIBLE FOR ANY UNAUTHORIZED USE OF THIS REPORT OR ITS CONCLUSIONS.

ADDITIONAL COMMENTS (SCOPE OF WORK, EXTRAORDINARY ASSUMPTIONS, HYPOTHETICAL CONDITIONS, ETC.):

**GP 2-4 UNIT**

# CERTIFICATIONS

File No.: PA 14036

| Property Address: | 941 E 104th St | | City: Brooklyn | State: NY | Zip Code: 11236 |

| Client | PRIVATE | Address: | 941 E. 104TH STREET , BROOKLYN , NY 11236 |
| Appraiser: | JESSE ZUCKERMAN/ PRESTIGE APPRAISALS INC | Address: | 184 HICKORY LANE SMITHTOWN, NY 11787 |

## APPRAISER'S CERTIFICATION

I CERTIFY THAT, TO THE BEST OF MY KNOWLEDGE AND BELIEF:

- THE STATEMENTS OF FACT CONTAINED IN THIS REPORT ARE TRUE AND CORRECT.
- THE CREDIBILITY OF THIS REPORT, FOR THE STATED USE BY THE STATED USER(S), OF THE REPORTED ANALYSES, OPINIONS, AND CONCLUSIONS ARE LIMITED ONLY BY
THE REPORTED ASSUMPTIONS AND LIMITING CONDITIONS, AND ARE MY PERSONAL, IMPARTIAL, AND UNBIASED PROFESSIONAL ANALYSES, OPINIONS, AND CONCLUSIONS.
- I HAVE NO PRESENT OR PROSPECTIVE INTEREST IN THE PROPERTY THAT IS THE SUBJECT OF THIS REPORT AND NO PERSONAL INTEREST WITH RESPECT TO THE PARTIES INVOLVED.
- UNLESS OTHERWISE INDICATED, I HAVE PERFORMED NO SERVICES, AS AN APPRAISER OR IN ANY OTHER CAPACITY, REGARDING THE PROPERTY THAT IS THE SUBJECT OF THIS REPORT WITHIN THE THREE-YEAR PERIOD IMMEDIATELY PRECEDING ACCEPTANCE OF THIS ASSIGNMENT.
- I HAVE NO BIAS WITH RESPECT TO THE PROPERTY THAT IS THE SUBJECT OF THIS REPORT OR TO THE PARTIES INVOLVED WITH THIS ASSIGNMENT.
- MY ENGAGEMENT IN THIS ASSIGNMENT WAS NOT CONTINGENT UPON DEVELOPING OR REPORTING PREDETERMINED RESULTS.
- MY COMPENSATION FOR COMPLETING THIS ASSIGNMENT IS NOT CONTINGENT UPON THE DEVELOPMENT OR REPORTING OF A PREDETERMINED VALUE OR DIRECTION
IN VALUE THAT FAVORS THE CAUSE OF THE CLIENT, THE AMOUNT OF THE VALUE OPINION, THE ATTAINMENT OF A STIPULATED RESULT, OR THE OCCURRENCE OF A SUBSEQUENT EVENT DIRECTLY RELATED TO THE INTENDED USE OF THIS APPRAISAL.
- MY ANALYSES, OPINIONS, AND CONCLUSIONS WERE DEVELOPED, AND THIS REPORT HAS BEEN PREPARED, IN CONFORMITY WITH THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE THAT WERE IN EFFECT AT THE TIME THIS REPORT WAS PREPARED.
- I DID NOT BASE, EITHER PARTIALLY OR COMPLETELY, MY ANALYSIS AND/OR THE OPINION OF VALUE IN THE APPRAISAL REPORT ON THE RACE, COLOR, RELIGION,
SEX, HANDICAP, FAMILIAL STATUS, OR NATIONAL ORIGIN OF EITHER THE PROSPECTIVE OWNERS OR OCCUPANTS OF THE SUBJECT PROPERTY, OR OF THE PRESENT
OWNERS OR OCCUPANTS OF THE PROPERTIES IN THE VICINITY OF THE SUBJECT PROPERTY.
- UNLESS OTHERWISE INDICATED, I HAVE MADE A PERSONAL INSPECTION OF THE PROPERTY THAT IS THE SUBJECT OF THIS REPORT.
- UNLESS OTHERWISE INDICATED, NO ONE PROVIDED SIGNIFICANT REAL PROPERTY APPRAISAL ASSISTANCE TO THE PERSON(S) SIGNING THIS CERTIFICATION.

ADDITIONAL CERTIFICATIONS:

DEFINITION OF MARKET VALUE *:

MARKET VALUE MEANS THE MOST PROBABLE PRICE WHICH A PROPERTY SHOULD BRING IN A COMPETITIVE AND OPEN MARKET UNDER ALL CONDITIONS REQUISITE
TO A FAIR SALE, THE BUYER AND SELLER EACH ACTING PRUDENTLY AND KNOWLEDGEABLY, AND ASSUMING THE PRICE IS NOT AFFECTED BY UNDUE STIMULUS.
IMPLICIT IN THIS DEFINITION IS THE CONSUMMATION OF A SALE AS OF A SPECIFIED DATE AND THE PASSING OF TITLE FROM SELLER TO BUYER UNDER CONDITIONS
WHEREBY:

1. BUYER AND SELLER ARE TYPICALLY MOTIVATED;
2. BOTH PARTIES ARE WELL INFORMED OR WELL ADVISED AND ACTING IN WHAT THEY CONSIDER THEIR OWN BEST INTERESTS;
3. A REASONABLE TIME IS ALLOWED FOR EXPOSURE IN THE OPEN MARKET;
4. PAYMENT IS MADE IN TERMS OF CASH IN U.S. DOLLARS OR IN TERMS OF FINANCIAL ARRANGEMENTS COMPARABLE THERETO; AND
5. THE PRICE REPRESENTS THE NORMAL CONSIDERATION FOR THE PROPERTY SOLD UNAFFECTED BY SPECIAL OR CREATIVE FINANCING OR SALES CONCESSIONS
GRANTED BY ANYONE ASSOCIATED WITH THE SALE.
* THIS DEFINITION IS FROM REGULATIONS PUBLISHED BY FEDERAL REGULATORY AGENCIES PURSUANT TO TITLE XI OF THE FINANCIAL INSTITUTIONS
REFORM, RECOVERY, AND ENFORCEMENT ACT (FIRREA) OF 1989 BETWEEN JULY 5, 1990, AND AUGUST 24, 1990, BY THE FEDERAL RESERVE SYSTEM
(FRS), NATIONAL CREDIT UNION ADMINISTRATION (NCUA), FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC), THE OFFICE OF THRIFT SUPERVISION (OTS),
AND THE OFFICE OF COMPTROLLER OF THE CURRENCY (OCC). THIS DEFINITION IS ALSO REFERENCED IN REGULATIONS JOINTLY PUBLISHED BY THE OCC, OTS,
FRS, AND FDIC ON JUNE 7, 1994, AND IN THE INTERAGENCY APPRAISAL AND EVALUATION GUIDELINES, DATED OCTOBER 27, 1994.

| Client Contact: | N/a | | Client Name: | PRIVATE |
| E-Mail: | N/A | Address: | 941 E. 104TH STREET , BROOKLYN , NY 11236 |

| **APPRAISER** | **SUPERVISORY APPRAISER** (if required) or CO-APPRAISER (if applicable) |
|---|---|
| Appraiser Name: JESSE ZUCKERMAN/ PRESTIGE APPRAISALS INC. | Supervisory or Co-Appraiser Name: |
| Company: PRESTIGE APPRAISALS INC | Company: |
| Phone: (917) 575-0362  Fax: (631) 539-6478 | Phone:  Fax: |
| E-Mail: JESSE4424@OPTONLINE.NET (EMAIL) | E-Mail: |
| Date Report Signed: 07/10/2019 | Date Report Signed: |
| License or Certification #: 45000048034  State: NY | License or Certification #:  State: |
| Designation: | Designation: |
| Expiration Date of License or Certification: 07/21/2019 | Expiration Date of License or Certification: |
| Inspection of Subject: ☒ Interior & Exterior ☐ Exterior Only ☐ None | Inspection of Subject: ☐ Interior & Exterior ☐ Exterior Only ☐ None |
| Date of Inspection: 07/08/2019 | Date of Inspection: |

SIGNATURES

Copyright© 2007 by a la mode, Inc. This form may be reproduced unmodified without written permission, however, a la mode, Inc. must be acknowledged and credited.

Form GP2-4AD - "TOTAL" appraisal software by a la mode, inc. - 1-800-ALAMODE

GP 2-4 UNIT

1/2007

**Supplemental Addendum**                          File No. FA 14056

| Borrower/Client: | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 94′ E 104th St | | | | | |
| City | Brooklyn | County QUEENS | | State NY | Zip Code ′1256 | |
| Lender/Client: | FR VATE | | | | | |

### COMMENTS ON SALES COMPARISON

550 PER SQFT LIVING AREA ADJUSTMENT WHERE APPROPRIATE, PLUS OR MINUS BATH ADJUSTMENT; CONDITION INFORMATION IS BASED ON INFO GATHERED FROM A DRIVE-BY INSPECTION, MLS AND CONVERSATIONS WITH LOCAL REALTORS. COMPS SELECTED WERE THE BEST AVAILABLE CLOSED SALES IN THE SUBJECT AREA AND FAIRLY REPRESENT A MARKET VALUE FOR THE SUBJECT PROPERTY.

### COMMENTS ON SQFT GLA, BATH, SITE, AND AGE ADJUSTMENTS

ADJUSTMENTS FOR GLA ARE ROUNDED TO THE NEAREST $500 AS MARKET WOULD NORMALLY NOT ADJUST IN LESS THAN $500 INCREMENTS. ADJUSTMENTS IN GLA OF 100 SQFT OR LESS ARE NOT MADE AS MARKET WOULD NOT RECOGNIZE OR ACCOUNT FOR THESE MINOR DIFFERENCES. DIFFERENCES IN BATH COUNT ARE ADJUSTED AT $5000 PER HALF BATH. SITE ADJUSTMENTS ARE MADE ONLY WHERE A SIGNIFICANT DIFFERENCE EXISTS IN LOT SIZE AND WHERE MARKET WOULD RECOGNIZE AND ACCOUNT FOR SUCH DIFFERENCES. WHEN NO SITE ADJUSTMENT IS MADE IT IS ASSUMED THAT THE MARKET WOULD NOT REFLECT THE DIFFERENCE. NO AGE ADJUSTMENTS ARE MADE WHEN SUBJECT AND COMPS HAVE SIMILAR EFFECTIVE AGES. IF AGE ADJUSTMENTS ARE MADE IT IS DUE TO THE FACT THAT A SIGNIFICANT DIFFERENCE IN EFFECTIVE AGE EXISTS.

NOTE: ALL ELECTRONIC SIGNATURES ON THIS REPORT HAVE A SECURITY FEATURE MAINTAINED BY INDIVIDUAL PASSWORDS FOR EACH SIGNING APPRAISER. NO PERSON CAN ALTER THE APPRAISAL WITH THE EXCEPTION OF THE ORIGINAL SIGNING APPRAISER.

NOTE: THE ROADS THAT TRAVERSE THE NEIGHBORHOOD DO NOT POSE ANY SORT OF MARKET DIVISION.

NOTE: ALL UTILITIES WERE CHECKED AND IN WORKING ORDER.

I HAVE NOT PERFORMED ANY SERVICES AS AN APPRAISER OR IN ANY CAPACITY . REGARDING THE PROPERTY THAT IS THE SUBJECT OF THIS REPORT WITHIN THE 3 YEAR PERIOD IMMEDIATELY PRECEDING ACCEPTANCE OF THIS ASSIGNMENT.

CURRENTLY AT THE ESTIMATED MARKET VALUE OF THE SUBJECT THE EXPOSURE TIME TO SELL AT THE ESTIMATED MARKET VALUE IS 4-6 MONTHS.

NOTE: NO VALUE IS GIVEN TO SHEDS AS THIS IS NOT TYPICAL AS PER THE INDUSTRY. SHEDS ARE NOT GLA OR A PERMANENT STRUCTURE AND DO NOT HAVE HEAT OR ELECTRICITY.

NOTE: IN THE PRESENT LAND USE OF THE NEIGHBORHOOD SECTION ( OTHER ) REPRESENTS, POLICE STATIONS, FIRE DEPARTMENTS, PARKS AND OTHER MUNICIPALITY IN THE SUBJECT AREA.

THE SEARCH CRITERIA OF THE SUBJECT PROPERTY WAS BASED ON THE SUBJECTS LOCATION, CONDITION, GROSS LIVING AREA AND GENERAL AMENITIES. THE PROPERTIES APPLIED IN THE REPORT WERE DEEMED AS THE BEST AVAILABLE FOR PROPER MARKET COMPARISON AND NO BETTER SALES WERE NOTED. OTHER LISTINGS AND SALES IN THE OVERALL MARKET SEARCH ARE PART OF THE APPRAISAL FILE AND KEPT FOR EXTREME LOWER/UPPER END OF THIS MARKET SEGMENT OF HOME SALES. THIS ADDITIONAL PROPERTY DATA IS BETTER FIT FOR VALUE SUPPORT BUT NOT AS TRULY COMPARABLE TO SUBJECT PROPERTY AND THEREFORE, NOT INCLUDED IN THE APPRAISAL REPORT.

### LEAD BASED PAINT DISCLOSURE:
HOUSING BUILT BEFORE 1978 MAY CONTAIN LEAD BASED PAINT. LEAD FROM PAINT, PAINT CHIPS, AND DUST CAN POSE HEALTH HAZARDS IF NOT MANAGED PROPERLY. LEAD EXPOSURE IS ESPECIALLY HARMFUL TO YOUNG CHILDREN AND PREGNANT WOMEN.

### PHYSICAL DEFICIENCIES OR ADVERSE CONDITIONS:
NO APPARENT ADVERSE CONDITION WERE NOTED. THE MECHANICAL SYSTEMS OF THE PROPERTY WERE NOT TESTED. YOUR APPRAISER HAS NOT BEEN TRAINED IN THIS FIELD AND IS NOT CONSIDERED AN EXPERT AS TO TESTIFY ON THE LIVABILITY, SOUNDNESS OR STRUCTURAL INTEGRITY OF THE SUBJECT PROPERTY. IF A FULL BUILDING INSPECTION IS REQUIRED FOR THIS TRANSACTION, THEN A LICENSED BUILDING INSPECTOR SHOULD BE CONTRACTED TO PERFORM ONE.

### SITE COMMENTS:
YOUR APPRAISER IS NOT DEEMED TO BE AN EXPERT IN EASEMENTS, ENCROACHMENTS, ENVIRONMENTAL CONDITIONS, LAND USES, ECT. NORMAL PUBLIC UTILITY EASEMENTS AND SETBACKS. NO APPARENT ADVERSE CONDITIONS ARE NOTED.

### INTENDED USERS:

## Supplemental Addendum

File No. 34-42995

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | |
| City | Brooklyn | County QUEENS | | State NY | Zip Code 11236 |
| Lender/Client | PRIVATE | | | | |

THE INTENDED USER OF THIS APPRAISAL REPORT IS THE LENDER/CLIENT. THE INTENDED USE OF THIS APPRAISAL IS TO EVALUATE THE PROPERTY THAT IS SUBJECT OF THIS REPORT FOR FAIR MARKET VALUE. NO ADDITIONAL INTENDED USERS ARE IDENTIFIED BY THE APPRAISER.

**FINAL RECONCILIATION:**
THE FINAL RECONCILIATION IS BASED ON THE SALES COMPARISON APPROACH AS IT IS DERIVED FROM THE MOST RELIABLE MARKET DATA. MOST WEIGHT WAS PLACED ON THE SALES COMPARISON APPROACH, AND THE LEAST WAS PLACED ON THE COST APPROACH. THE INCOME APPROACH IS NOT APPROPRIATE FOR THIS TYPE OF PROPERTY.

EXPOSURE TIME IS ALWAYS PRESUMED TO PRECEDE THE EFFECTIVE DATE OF THE APPRAISAL. IT IS THE ESTIMATED LENGTH OF TIME THE PROPERTY WOULD HAVE BEEN OFFERED ON THE MARKET, PRIOR TO THE HYPOTHETICAL SALE, AT THE APPRAISED VALUE, ON THE EFFECTIVE DATE OF THE APPRAISAL. IT IS A RETROSPECTIVE ESTIMATE BASED ON AN ANALYSIS OF PAST EVENTS ASSUMING A COMPETITIVE AND OPEN MARKET. THIS INCLUDES NOT ONLY ADEQUATE, SUFFICIENT AND REASONABLE TIME, BUT ADEQUATE, SUFFICIENT AND REASONABLE EFFORT. IT IS OFTEN EXPRESSED AS A RANGE AND IS BASED ON THE FOLLOWING.
1. STATISTICAL INFORMATION ABOUT DAYS ON MARKET. MOST COMMONLY OBTAINED FROM THE LOCAL MLS.
2. INFORMATION GATHERED THROUGH SALES VERIFICATION.
3. INTERVIEWS WITH MARKET PARTICIPANTS.
CURRENTLY AT THE ESTIMATED MARKET VALUE OF THE SUBJECT THE EXPOSURE TIME TO SELL AT THE ESTIMATED MARKET VALUE IS 4-6 MONTHS.

## SUBJECT PHOTO PAGE

| | | | | | |
|---|---|---|---|---|---|
| Borrower/Client | N/A | | | | |
| Property Address | 941 E 104th St | | | | |
| City | Brooklyn | County QUEENS | State NY | Zip Code | 11236 |
| Lender/Client | PRIVATE | | | | |



### SUBJECT FRONT

941 E. 104TH STREET
SALES PRICE          0
G.B.A.               1,600
AGE/YR.BLT.          89



### SUBJECT REAR



### SUBJECT STREET

## SUBJECT PHOTO PAGE

| Borrower/Client | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | | | |
| City | Brooklyn | County | QUEENS | State | NY | Zip Code | 11238 |
| Lender/Client | PRIVATE | | | | | | |



**SIDE**

941 E. 104TH STREET
SALES PRICE          0
GROSS BUILDING AREA 1,600
AGE                       89



**ELECTRIC METERS**



**DRIVEWAY**

## SUBJECT PHOTO PAGE

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | | |
| City | Brooklyn | County | QUEENS | State | NY | Zip Code | 11236 |
| Lender/Client | PRIVATE | | | | | |



### BOILER

941 E. 104TH STREET
SALES PRICE          0
GROSS BUILDING ARE 1,600
AGE                  89



**BASEMENT REC ROOM**



**BASEMENT BATH**

## SUBJECT PHOTO PAGE

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | | |
| City | Brooklyn | County | QUEENS | State | NY | Zip Code 11236 |
| Lender/Client | PRIVATE | | | | | |



**BASEMENT BEDROOM**

941 E. 104TH STREET
SALES PRICE            0
GROSS BUILDING AREA 1,600
AGE                        89



**ELECTRICAL PANELS**



**C/O DETECTORS**

## SUBJECT PHOTO PAGE

| | | | | |
|---|---|---|---|---|
| Borrower/Client | N/A | | | |
| Property Address | 941 E 104th St | | | |
| City | Brooklyn | County QUEENS | State NY | Zip Code 11236 |
| Lender/Client | PRIVATE | | | |



**UNIT 1 KITCHEN**

941 E. 104TH STREET
SALES PRICE          0
GROSS BUILDING AREA 1,600
AGE                 89
BORROWER/CLIENT
CLIENT



**UNIT 1 BATH**



**UNIT 1 LIVING ROOM**

## SUBJECT PHOTO PAGE

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | | |
| City | Brooklyn | County | QUEENS | State | NY | Zip Code 11236 |
| Lender/Client | PRIVATE | | | | | |



**UNIT 1 BEDROOM**

941 E. 104TH STREET
SALES PRICE        0
GROSS BUILDING ARE 1,600
AGE               89



**UNIT 1 BEDROOM**



**UNIT 2 KITCHEN**

## SUBJECT PHOTO PAGE

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | | |
| City | Brooklyn | County | QUEENS | State NY | Zip Code | 11236 |
| Lender/Client | PRIVATE | | | | | |



**UNIT 2 BATH**

941 E. 104TH STREET
SALES PRICE          0
GROSS BUILDING AREA 1,600
AGE                 89



**UNIT 2 LIVING ROOM**



**UNIT 2 BEDROOM**

# SUBJECT PHOTO PAGE

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | |
| City | Brooklyn | County QUEENS | State NY | Zip Code 11236 | |
| Lender/Client | PRIVATE | | | | |



**UNIT 2 BEDROOM**

941 E. 104TH STREET
SALES PRICE          0
GROSS BUILDING ARE 1,600
AGE                        89



**UNIT 2 OFFICE**

## COMPARABLE PHOTO PAGE

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | | |
| City | Brooklyn | County QUEENS | | State NY | Zip Code | 11236 |
| Lender/Client | PRIVATE | | | | | |



### COMPARABLE 1

1407 E. 99TH STREET
SALES PRICE        610,000
G.B.A             1,560
BORROWER/CLIENT  59
CLIENT



### COMPARABLE 2

1003 E 103RD STREET
SALES PRICE        577,349
G.B.A             1,760
AGE/YR BLT        64



### COMPARABLE 3

928 E. 105TH STREET
SALES PRICE        659,000
G.B.A.            1,907
AGE/YR. BLT.      64

## COMPARABLE PHOTO PAGE

| Borrower/Client: | WA | | | |
|---|---|---|---|---|
| Property Address | 94' E 104th St | | | |
| City | Brooklyn | County  QUEENS | State  NY | Zip Code  11258 |
| Lender/Client: | PRIVATE | | | |



### COMPARABLE 4

1026 E. 1C1ST STREET
SALLS PRICE         6'0,846
R.B.A.                   1,440
BORROW: VOLLEY    59
CLIENT

### COMPARABLE 5

SALES PRICE
G.B.A.
A.SE/YR. BLT,

### 6

SALES PRICE
G.B.A.
AG.EYR. BLT.

**Building Sketch**

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 841 E 104th St | | | | |
| City | Brooklyn | County | QUEENS | State NY | Zip Code 11236 |
| Lender/Client | PRIVATE | | | | |



## Location Map

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | | |
| City | Brooklyn | | County | QUEENS | State | NY | Zip Code | 11236 |
| Lender/Client | PRIVATE | | | | | |



## Aerial Map

| Borrower/Client | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 941 E 104th St | | | | | | |
| City | Brooklyn | County | QUEENS | State | NY | Zip Code | 11236 |
| Lender/Client | PRIVATE | | | | | | |



**E&O – Page 1**



**P L C S I**

PROFESSIONAL LIABILITY CONSULTING SERVICES, INC.

&

Thursday, July 19, 2018

Mr. Jesse G. Zuckerman, *Owner*
Prestige Appraisals, Inc.
184 Hickory Lane
Smithtown, NY  11787

**Re:**        **Binder & Invoice – ID#: 163903**
              **Real Estate Professionals Errors & Omissions (E&O) Insurance**
**Effective:**  **8/2/2018 to 8/2/2019 at 12:01 A.M. Standard Time**

Dear Jesse:

As per your recent request, please be advised that Real Estate Professionals Errors &
Omissions (E&O) Insurance coverage has been bound with Continental Casualty
Company (CNA), an admitted carrier in the State of New York, which has an AM Best
rating of A (Excellent). Coverage terms are as follows:

| Limits of Liability (Per Claim/Aggregate) | Deductible Per Claim | Annual Premium |
|---|---|---|
| $1,000,000/$1,000,000 | $5,000 | $1,412.00 |

i.   Defense Expenses are outside the Limits of Liability. Defense Expenses will not erode
     the available Limits of Liability to pay for Damages.
ii.  First Dollar Defense Coverage. The Deductible will apply to Damages only.

**Retroactive / Prior Acts Coverage Date:**  *8/2/2007*

*Please be advised that the following titles and headings are for convenience only. Please
refer to the actual policy and endorsement(s) for a complete description of coverage.*

**Policy Form:**  CNA65781NY Ed. (03-14) Real Estate Professionals E&O Policy New York
                 CNA68180NY (4-14) Cancellation/Non-Renewal Endorsement New York
                 CNA76046NY (2-14) Addendum To The Policy Application and
                 Declarations Policyholder Notice New York.

**Environmental Hazards Coverage:** Included to policy limits for the failure, in any way, to
advise of the existence of pollutants, radon, asbestos, and lead. Includes claim expense
and damage.

45 Knollwood Road · Suite 202 · Elmsford, NY 10523
P 914.592.6505 · F 914.592.6508 · www.plcsi.com



PLCSI

Thursday, July 19, 2018
Page 2 of 2

**Additional Policy Coverage Enhancements:**

**Vicarious Liability & Disparate Impact Discrimination:** The premium calculated above includes a sub-limit of $250,000. **Note:** Higher limits not elected offered.

**Residential Ownership Coverage:** Not Elected. **Note:** It is very important to disclose whether or not any proposed insured is selling properties which are wholly or partially owned. Please advise, in writing, if you are interested in this coverage.

**Construction Development:** Not Elected. **Note:** It is very important to disclose whether or not the applicant / insured engages in the actual or attempted sale of real property, which is developed or constructed by a business entity owned by the applicant / insured and not identified on the application.

**Contingent Bodily/Property Damage Coverage - Professional Services:** Not Elected.

**Additional Exclusions:**

1. Professional Services as a Construction Phase Inspector are excluded.
2. All material endorsements will carry forward.

| | |
|---|---|
| **Required Documentation:** | None Required. |
| **Premium Financing:** | Not Elected. |
| **Payment Due:** | Paid In Full.<br>(Includes $100.00 PLCSI Broker Fee) |

Our office is prepared to help you in every possible way. Please do not hesitate to contact us if you have any questions or would like to discuss this matter in further detail.

Sincerely,

**Professional Liability Consulting Services, Inc.**

Dennis M. Supraner
President

# EXHIBIT "C"

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X          Chapter 13

In Re:

                                                            Case No.: 1-19-42993-cec

DEANA MCALMON,

                                                    AFFIDAVIT OF CONTRIBUTION

                                    Debtor(s).
---------------------------------------------------------X

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF NASSAU       )

        GLADSTONE C. MCALMON being duly sworn, depose and say as follows:

        1. I am the ex-husband of the debtors herein and submit this affidavit in
support of her proposed chapter 13 plan.
        2. I reside at 941 E. 104th Street, Brooklyn, NY 11236
        3. I am employed by Logan Payroll Systems, and I receive income
of approximately $11,530.88 gross per month. A copy of my pay stub is attached.
        4. I will contribute $2,000.00 of my income to the debtor's budget.

        WHEREFORE, your affiant prays that this affidavit be accepted and that the
Chapter 13 filing by DEANA MCALMON he allowed to proceed to completion.

                                        _____
                                        GLADSTONE C. MCALMON

Sworn to before me this
___ day of _____ 2019
                                        ANGELA YADGAROV
                                        NOTARY PUBLIC-STATE OF NEW YORK
                                            No. 01YA6206814
Notary Public                            Qualified in Queens County
                                        My Commission Expires 05-26-20__

‖

**CO** 32  **DPT** 100  **Clock#**  **VOUCHER NO**
EE  07489  **ID**  Q8299  622535

**Control No:** 300727
**Period Ending Date:** 5/5/2019
**Pay Date:** 5/10/2019

**Bobby's Bus Company, Inc.**
**LOGAN PAYROLL SYSTEMS**
**97-14 ATLANTIC AVENUE**
**OZONE PARK, NY 11416**

**Gladstone C McAlmon**

941 East 104th Street
Brooklyn, NY 11236

· Federal Marital Status:  Single
  Federal Exemptions:  0
  Rate/Salary:  2,550.40

## Summary

| | | | | |
|---|---|---|---|---|
| **Gross Pay** | | | 2,550.40 | |
| **Net Check** | | | 1,416.02 | |

| Earnings Detail | Rate | Hours | Current | Dept/Job |
|---|---|---|---|---|
| Regular Pay | 31.8800 | 40.00 | 1,275.20 | 32100 |
| Supplement | 0.0000 | 0.00 | 1,275.20 | 32100 |
| 1181 Wage Acc | 0.0000 | 0.00 | 0.00 | 32100 |
| Bonus | 0.0000 | 0.00 | 0.00 | 32100 |
| Holiday Pay | 0.0000 | 0.00 | 0.00 | 32100 |
| SNOW DAY | 0.0000 | 0.00 | 0.00 | 32100 |

| Taxes | Curr | YTD |
|---|---|---|
| F.I.C.A. | 156.21 | 2,474.05 |
| F.I.C.M. | 36.53 | 578.61 |
| FIT | 475.10 | 6,965.91 |
| Family Leave | 3.55 | 59.19 |
| State Tax | 151.26 | 2,417.44 |
| City Tax | 96.95 | 1,450.84 |

| Deductions | Curr | YTD |
|---|---|---|
| Credit Union | 100.00 | 1,600.00 |
| Defense | 2.00 | 30.00 |
| Emp Medical | 30.95 | 495.20 |
| Pension | 43.77 | 683.08 |
| Un Dues 1181 | 38.26 | 595.31 |

### Other Information

| | |
|---|---|
| Fed taxable wages this check: | $2,319.45 |
| Your year-to-date gross is: | $40,399.19 |

**VOUCHER NO.  622535**

**Bobby's Bus Company, Inc.**
**LOGAN PAYROLL SYSTEMS**
**97-14 ATLANTIC AVENUE**
**OZONE PARK, NY 11416**

**CO:** 32  **Net Amount**

Pay Date:  5/10/2019

Pay to the order of:  Gladstone C McAlmon  **$****1,416.02******

One Thousand Four Hundred Sixteen Dollars and 02 Cents

*** VOID *** NON NEGOTIABLE *** VOID ***

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

In Re:

DEANA MCALMON,

Debtor(s).

----------------------------------------------------------X

Chapter 13

Case No.: 1-19-42993-cec

**AFFIDAVIT OF CONTRIBUTION**

STATE OF NEW YORK  )
                   )  ss:
COUNTY OF NASSAU   )

Alicia Spearman being duly sworn, depose and say as follows:

1.  I am the daughter of the debtor herein and submit this affidavit in
support of her proposed chapter 13 plan.

2.  I reside at 941 E. 104th Street, Brooklyn, NY 11236.

3.  I am employed by US Army, and I receive income of approximately

$ 3396. 60 gross per month. A copy of my pay stub is attached.

4.  I will contribute $ 300 of my income to the debtor's budget.

WHEREFORE, your affiant prays that this affidavit be accepted and that the

Chapter 13 filing by DEANA MCALMON be allowed to proceed to completion.

ALICIA SPEARMAN

Sworn to before me this
_ day of _____, 2019

Notary Public

ANGELA YADGAROV
NOTARY PUBLIC-STATE OF NEW YORK
No. 01YA6206614
Qualified in Queens County
My Commission Expires 06-26-20

## DEFENSE FINANCE AND ACCOUNTING SERVICE MILITARY LEAVE AND EARNINGS STATEMENT

| ID | NAME (Last, First,MI) | SOC. SEC. NO. | GRADE | PAY DATE | YRS SVC | ETS | BRANCH | ADSN/DSSN | PERIOD COVERED |
|---|---|---|---|---|---|---|---|---|---|
| | SPEARMAN ALICIA M | ***-**-7260 | E5 | 080325 | 13 | 201217 | ARMY | 4663 | 1-31 JUL 18 |

| ENTITLEMENTS | | DEDUCTIONS | | ALLOTMENTS | | SUMMARY | |
|---|---|---|---|---|---|---|---|
| Type | Amount | Type | Amount | Type | Amount | +Amt Fwd | 00 |
| A BASE PAY | 3396 60 | FEDERAL TAXES | 311 39 | US DEBT | 133 34 | +TOT ENT | 3774 69 |
| B BAS | 369 39 | FICA-SOC SECURITY | 216 59 | | | | |
| C BAH | 8 70 | FICA-MEDICARE | 49 25 | | | -TOT DED | 2195 33 |
| D | | SGLI | 28 00 | | | | |
| E | | STATE TAXES | 164 04 | | | -TOT ALMT | 133 34 |
| F | | AFRH | 50 | | | | |
| G | | MID-MONTH-PAY | 1445 66 | | | =NET AMT | 1445 02 |
| H | | | | | | | |
| I | | | | | | -CR FWR | 00 |
| J | | | | | | | |
| K | | | | | | =EOM PAY | 1445 02 |
| L | | | | | | | |
| M | | | | | | | |
| N | | | | | | | |
| O | | | | | | | |
| | TOTAL | 3774 69 | | 2195 33 | | 133 34 | |

| | | | | | | | | | DIEMS | RET PLAN |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 030720 | BLENDE |

| LEAVE | BF Bal | Emd | Used | Cr Bal | ETS Bal | Lv Lost | Lv Paid | Use/Lose | FED TAXES | Wage Period | Wage YTD | M/S | Ex | Add'l Tax | Tax YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 18 0 | 25 0 | 19 | 26 0 | 60 6 | 0 | 0 | 5 | | 3396 60 | 23776 26 | S | 01 | 00 | 2179 73 |

| FICA TAXES | Wage Period | Soc Wage YTD | Soc Tax YTD | Med Wage YTD | Med Tax YTD | STATE TAXES | St | Wage Period | Wage YTD | M/S | Ex | Tax YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3396 60 | 23776 20 | 1474 13 | 23776 20 | 344 75 | | NY | 3396 60 | 23776 20 | S | 01 | 1070 26 |

| PAY DATA | BAQ Type | BAQ Depn | VHA Zip | Rent Amt | Share | Stat | JFTR | Depns | 2D JFTR | BAS Type | Charity YTD | TPC | PACIDN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | PARTIAL | | 56000 | 00 | 0 | | | 0 | | | 00 | | TW12L326 |

| TRADITIONAL PLAN (TSP) | Base Pay Rate | Base Pay Current | Spec Pay Rate | Spec Pay Current | Inc Pay Rate | Inc Pay Current | Bonus Pay Rate | Bonus Pay Current |
|---|---|---|---|---|---|---|---|---|
| | 0 | 00 | 0 | 00 | 0 | 00 | 0 | 00 |
| ROTH PLAN | 0 | 00 | 0 | 00 | 0 | 00 | 0 | 00 |

| CM AGCY CONTR | AGCY-AUTO | AGC-MATCH | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 33 97 | | | | | | | |

| CONTRIBUTIONS TOTALS | YTD Deductions | YTD TSP Deferred | YTD TSP Exempt | YTD ROTH | YTD TSP AGCY-AUTO | YTD TSP AGCY-MATCH |
|---|---|---|---|---|---|---|
| | 00 | 00 | 00 | 00 | 237 76 | 00 |

**REMARKS:**            YTD ENTITLE 26422.03            YTD DEDUCT 7657.01

IF TSP ELECTION AMT EXCEEDS NET AMT
DUE. TSP WILL NOT BE DEDUCTED.
-THE SERVICE MEMBERS GROUP LIFE INSURANCE AND
FAMILY SGLI PREMIUM RATES WILL BE REDUCED
EFFECTIVE 7/01/19 FOR RATES VISIT. HTTPS //
WWW BENEFITS VA GOV/INSURANCE/SGLI ASP
-EFFECTIVE 7/12/19. ELIGIBILITY TO TRANSFER
POST-9/11 GI BILL BENEFITS TO QUALIFYING
FAMILY MEMBERS WILL CHANGE. VISIT HTTPS //
MILCONNECT DMDC OSD MIL/MILCONNECT/PUBLIC/
FAQ/EDUCATION/EDUCATION_BENEFITS-HOW_TO_
TRANSFER_(LC)

-BURN PIT EXPOSURE MAY CAUSE HEALTH EFFECTS
AIRBORNE HAZARDS AND OPEN BURNPIT REGISTRY IS
OPEN VISIT. HTTPS //WWW PUBLICHEALTH VA GOV/
EXPOSURES/BURNPITS/REGISTRY ASP
MEMBER'S SGLI COVERAGE AMOUNT IS  $400,000
STOP  INDEBTEDNESS      190702(182)
CHANGE  AGENCY CONTRIBTN      190701(182)
YOUR MYPAY PASSWORD WAS CHANGED
CALL 1-888-332-7411 OR 216-522-5122 IF YOU
DID NOT CHANGE YOUR PASSWORD
RATE CHG SGLI      190701(182)
BANK  NAVY FEDERAL CREDIT UNION

DFAS Form 702, Jan 02

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In Re:

DEANA MCALMON,

Debtor(s).
-------------------------------------------------------------X

Chapter 13

Case No.: 1-19-42993-cec

AFFIDAVIT OF CONTRIBUTION

STATE OF NEW YORK    )
                     )  ss:
COUNTY OF NASSAU     )

MICHAEL MCALMON being duly sworn, depose and say as follows:

1.    I am the son of the debtor herein and submit this affidavit in

support of her proposed chapter 13 plan.

2.    I reside at 941 E. 104th Street, Brooklyn, NY 11236.

3.    I am employed by Unity Hospital Medical Center, and I receive income

of approximately $ 5200 gross per month. A copy of my pay stub is

attached.

4.    I will contribute $600.00 of my income to the debtor's budget.

WHEREFORE, your affiant prays that this affidavit be accepted and that the

Chapter 13 filing by DEANA MCALMON be allowed to proceed to completion.

MICHAEL MCALMON

Sworn to before me this
4th day of August , 2019

Kathleen M. Auberger
Notary Public

Kathleen M. Auberger
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01AU6306958
Qualified in Monroe County
Commission Expires January 14, 2023

Case 1-19-42993-cec   Doc 26   Filed 08/13/19   Entered 08/13/19 22:58:31

# Earnings Statement

ROCHESTER UNITY HOSPITAL ROCHESTER
REGIONALHEALTH 100 KINGS HIGHWAY SOUTH
ROCHESTER NY 14617
585-922-1770

| | |
|---|---|
| Period Beginning: | 07/21/2019 |
| Period Ending: | 08/03/2019 |
| Pay Date: | 08/09/2019 |

Taxable Marital Status:   Single
Exemptions/Allowances:
Federal:   0
NY:   0

MICHAEL J MCALMON
2771 LATTA ROAD
ROCHESTER NY 14612

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | 28.4200 | 74.23 | 2,109.82 | 28,832.37 |
| Certificate | | | 185.58 | 3,150.02 |
| Charpay | 1.5000 | 4.93 | 4.93 | 60.99 |
| Lladsbia | | | 2.23 | 35.58 |
| Rn4 | | | 322.69 | 3,779.94 |
| Shift Evening | 1.0000 | 16.71 | 16.71 | 263.53 |
| Shift Wknd Day | 1.0000 | 17.00 | 17.00 | 201.51 |
| Shift Wknd Eve | 2.2507 | 7.02 | 15.80 | 296.13 |
| Overtime | | | | 1,449.32 |
| Bonus | | | | 1,000.00 |
| Holiday | | | | 918.48 |
| Premium C1 | | | | 325.16 |
| Pto | | | | 4,207.58 |
| Shift Night | | | | 5.40 |
| Tm Mtg | | | | 16.48 |
| Tuition Qual | | | | 3,325.00 |
| Vactionus | | | | 896.08 |
| **Gross Pay** | | | **$2,673.68** | 49,215.17 |

| Other | this period | year to date |
|---|---|---|
| Add Employee | -1.65 | 26.46 |
| Dental High | -14.73 | 235.68 |
| Legal Services | -7.60 | 121.60 |
| Life Employee | -4.52 | 72.32 |
| Ltdbia | -2.23 | 35.68 |
| Medical Copay | -92.40* | 1,478.40 |
| Vision | -3.47 | 55.52 |
| 403B Reg S Amt | -306.68* | 9,428.51 |
| **Net Pay** | | **$1,557.63** |
| Checking 1 | -1,557.63 | |
| **Net Check** | | **$0.00** |

\* Excluded from federal taxable wages

Your federal taxable wages this period are
$2,159.63

| Deductions | Statutory | | |
|---|---|---|---|
| | Federal Income Tax | -282.82 | 6,460.63 |
| | Social Security Tax | -152.79 | 2,735.85 |
| | Medicare Tax | -35.74 | 639.84 |
| | NY State Income Tax | -105.16 | 1,973.89 |
| | NY SUI/SDI Tax | -1.20 | 19.20 |
| | NY Paid Family Leave Ins | -3.04 | 70.19 |

| Other Benefits and Information | this period | total to date |
|---|---|---|
| Gtl | 0.38 | 8.06 |
| Pto Accrual | | 8.66 |
| Pto Balance | | 38.54 |
| Your Day Bal | | 7.20 |

P329 AM XX

ROCHESTER UNITY HOSPITAL ROCHESTER
REGIONALHEALTH 100 KINGS HIGHWAY SOUTH
ROCHESTER. NY 14617
585-922-1770

Advice number:   00000322472
Pay date:   08/09/2019

Deposited to the account of
MICHAEL J MCALMON

| account number | transit ABA | amount |
|---|---|---|
| xxxxx2877 | xxxx xxxx | $1,557.63 |

NON-NEGOTIABLE

# EXHIBIT "D"

# Official Record of Benefit Payment History

## Current Claim

|  |  |
|---|---|
| Name | Deana M. Mcalmon |
| Social Security Number | XXX-XX-6167 |
| Claim Effective Date | 05/13/2019 |
| Benefits Will Stop Showing... | 05/17/2020 |
| Weekly Benefit Amount | $450.00 |
| Maximum Benefit Amount | $11,700.00 |
| Effective Days Remaining | 76 |

# Latest Transaction(s) as of 07/28/2019

- You last certified for benefits for the week ending 07/21/2019.
- Your payment for the week ending 07/21/2019 was released on 07/23/2019.

### *Effective Days*

Each day in a week (Monday through Sunday) that you qualify for benefits is called an effective day. There is a maximum of 4 effective days each week, and you must qualify for all 4 effective

days in order to receive your total weekly benefit rate. For each day in the week that you are not eligible to receive benefits, you will receive one less effective day, which is equivalent to one fourth of your weekly benefit rate. For example, if you are not available to work one day in a week, or if you have worked any part of a day, or have received vacation or holiday pay for one day in a week, your benefits will be reduced by one effective day (the same as one-quarter of your benefit rate). You can receive a maximum of 104 effective days on your claim.

If three days have passed since a payment was released and the funds are not in your account, you should contact KeyBank Customer Service at **(866) 295-2955** if you have a debit card. If you have direct deposit, contact your bank. If there is a holiday in a given week, payments may be delayed by one day that week.

## Payment History

| Week Ending | Total Amount | Net Amount | Effective Days | Release Date | Type |
|---|---|---|---|---|---|
| 07/21/2019 | $450.00 | $393.75 | 4 | 07/23/2019 | Direct Deposit |
| 07/14/2019 | $450.00 | $393.75 | 4 | 07/15/2019 | Direct Deposit |
| 07/07/2019 | $450.00 | $393.75 | 4 | 07/08/2019 | Direct Deposit |
| 06/16/2019 | $450.00 | $393.75 | 4 | 06/17/2019 | Direct Deposit |
| 06/09/2019 | $450.00 | $393.75 | 4 | 06/11/2019 | Direct Deposit |

| Week Ending | Total Amount | Net Amount | Effective Days | Release Date | Type |
|---|---|---|---|---|---|
| 06/02/2019 | $450.00 | $393.75 | 4 | 06/03/2019 | Direct Deposit |
| 05/26/2019 | $450.00 | $393.75 | 4 | 05/28/2019 | Direct Deposit |
| 05/19/2019 | $0.00 | $0.00 | 4 | 05/23/2019 | Waiting week |

# Unemployment Insurance Terms

## Unemployment Insurance Terms

### *Benefit Year Ending Date*

The Benefit Year Ending date (BYE) is the date your unemployment insurance claim ends and you can no longer collect benefits on that claim. If you remain unemployed after the BYE date and believe that you had sufficient employment to qualify for a new claim, you must immediately file a new claim.

## Payment History Terms

### *Total Amount*

The benefit amount to which you are entitled for the week.

### *Net Amount*

The total amount minus any deductions (such as child support or Federal tax withholding), i.e. the amount you received.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
In Re:

    DEANA MCALMON,

          Debtor(s)
--------------------------------------------------------X
STATE OF NEW YORK   )
                 ) ss.:
COUNTY OF NASSAU   )

Chapter 13

Case No.: 1-19-42993-cec

AFFIDAVIT OF SERVICE

    ANGELA A. YADGAROFF being duly sworn, say: I am not a party to the action, am over 18 years of age and reside in Queens County, New York.

    On August ___, 2019, I served the within:

**NOTICE OF MOTION FOR AN ORDER GRANTING DEBTOR'S REQUEST TO ENTER INTO THE LOSS MITIGATION PROCEEDING ATTORNEY AFFIRMATION**

    by depositing a true copy thereof enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State, addressed to each of the following persons at the last known address set forth after each name:

United States Trustee
Long Island Federal Courthouse
560 Federal Plaza - Room 560
Central Islip, NY 11722-4437

CIT BANK, N.A.
Bronster, LLP
156 W. 56th
New York, NY 10019

Michael J. Macco, Standing Ch 13 Trustee
2950 Express Drive South, Suite 109
Islandia, NY 11749

McCabe Weisberg & Conway
145 Huguenot Street, Suite 210
New Rochelle, NY 10801

_____
ANGELA A. YADGAROFF

Sworn to before me this
13th day of August 2019

_____
Notary Public

CHARLES WERTMAN
Notary Public, State of New York
No. 02WE624⬚⬚⬚3
Qualified in Nassau County
Commission Expires May 31, 20 23

Case No.: 1-19-42993-cec
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

In Re:

DEANA MCALMON,

Debtor(s).

## NOTICE OF MOTION FOR AN ORDER GRANTING DEBTOR'S REQUEST TO ENTER INTO THE LOSS MITIGATION PROCEEDING ATTORNEY AFFIRMATION

LAW OFFICES OF CHARLES WERTMAN, P.C.
Attorney for Debtor
Office and Post Office Address
11 Sunrise Plaza, Suite 301
Valley Stream, NY 11580
Tel.: 516-284-0900

To:

Attorney(s) for

Service of a copy of the within                    is hereby admitted.
Dated:

Attorney for _____

Sir: - Please Take Notice

NOTICE OF ENTRY that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on   ,.

NOTICE OF SETTLEMENT that an Order of which the within is a true copy will be presented for
settlement to the HON., one of the judges of the within named Court at  on the day of, 20__ at
M.

Dated:

Yours, etc.
CHARLES WERTMAN, ESQ.
Attorney for Debtor
LAW OFFICES OF CHARLES WERTMAN, PC
Office and Post Office Address
11 Sunrise Plaza, Suite 301
Valley Stream, NY 11580
Tel.: 516-284-0900

TO:
Attorney(s) for